# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### February 15, 2012 Session

## TROY MITCHELL v. FAYETTEVILLE PUBLIC UTILITIES

**Direct Appeal from the Circuit Court for Lincoln County**
**No. C1000141      Franklin L. Russell, Judge**

---

**No. M2011-00410-SC-R3-WC - Filed May 8, 2012**

---

The trial court awarded workers' compensation benefits to an injured lineman who had violated a rule requiring the use of protective gloves while in a bucket lift. The employer appealed, contending that the statutory defenses of willful misconduct and, more particularly, the willful failure or refusal to use a safety appliance or device precluded recovery. The appeal was referred to the Special Workers' Compensation Appeals Panel for a hearing and a report of findings of fact and conclusions of law in accordance with Tennessee Code Annotated section 50-6-225(e)(3) (2008). After oral argument before the Panel, but before the Panel filed its opinion, the case was transferred to the full Court. Because the evidence establishes that the employee admitted his knowledge of a regularly enforced safety rule, understood the rationale for the rule, and willfully (rather than negligently or recklessly) failed to comply, the injuries he suffered because of the rule violation are not compensable. The judgment of the trial court is, therefore, reversed and the case is dismissed.

**Tenn. Code Ann. § 50-6-225(e); Judgment of the Trial Court is Reversed and Dismissed**

GARY R. WADE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined. JANICE M. HOLDER, J., filed a separate dissenting opinion.

B. Duane Willis, Jr., Nashville, Tennessee, for the appellant, Fayetteville Public Utilities.

Sonya W. Henderson, Murfreesboro, Tennessee, for the appellee, Troy Mitchell.

## OPINION
### I. Facts and Procedural History

On January 5, 2009, Troy Mitchell (the "Employee"), a lead lineman for Fayetteville Public Utilities (the "Employer"), suffered electrical burns to his hands and his side. At the

time, the Employee and his crew were replacing a forty-foot power pole with a new pole forty-five feet in height. While the Employee was in a bucket lift near the top of the new pole preparing to attach a lightning arrestor, a copper ground wire that he held in his bare hands came into contact with a transformer on the older, charged pole some five feet below. The Employee received an electrical shock of approximately 7,200 volts. Other members of the crew were able to return the bucket (also referred to as a cradle) to ground level where first responders rendered aid. The Employee was initially transported to a hospital in Huntsville, Tennessee. Because of the severity of his injuries, however, he was transferred to Vanderbilt Medical Center's burn unit where he was treated, primarily by orthopaedic surgeon Dr. Jeffry Watson.

Dr. Watson found that the most significant injuries were to the first webspaces of each hand—the area between the thumbs and the index fingers. Dr. Watson described the injuries as "full-thickness loss of his skin down into his muscle . . . as well as into the nerves that go to the fingers or the index finger on the right side and more into the thumb on the left side." Dr. Watson performed a total of eight surgeries—five on the left hand and three on the right. These procedures included cleaning the wounds, cutting away dead tissue, and removing healthy skin from the Employee's forearms and upper arm to suture into the hands. Following these surgeries, Dr. Watson ordered physical and occupational therapy over a ten-month period in an effort to reduce the swelling in the Employee's hands and increase strength and flexibility.[1] Dr. Watson also treated the Employee for adhesive capsulitis in his shoulder—a condition where the shoulder becomes stiff and painful because of limitations in movement during a recovery period. Another physician treated the burn injuries to the Employee's side. Just over one year after the accident, the Employee was able to return to work in the same position he held at the time of the accident.

The Employee was thirty-six years old at the time of trial, had a high school education, and had previously worked as a cook, furnace technician, electrical apprentice, and electrical foreman. Certified as a general lineman, the Employee had worked for the Employer for over nine years. While having a satisfactory recovery based on the severity of his injuries, he continued to experience some numbness in his right index finger, a lack of strength in his grip, and "streak pain"—shooting pains through the arms that can last anywhere from five minutes to one hour. The injury to his side continued to cause some discomfort. The Employee was not taking any medications and had completed his physical therapy by the time of trial.

---

[1] Dr. Watson opined that the Employee had impairment ratings of 15% to the right upper extremity, 31% to the left upper extremity, and 26% to the body as a whole. When Dr. Watson released the Employee to return to work in January of 2010, he did so without any work restrictions. He stated that he did not foresee the Employee requiring any future medical care in regard to his injuries.

While conceding that the injury was employment-related, the Employer denied workers' compensation benefits because the Employee, while in the bucket lift, had removed his protective gloves before attempting to install metal staples in the crossarm of the pole, a violation of the Employer's safety policy.[2] A benefit review conference did not produce a settlement, and afterward, the Employee filed suit. In response, the Employer asserted as a defense the Employee's willful misconduct and, more particularly, his willful failure to use a safety appliance, as defined by Tennessee Code Annotated section 50-6-110(a) (2008).

At trial, counsel for the Employee and the Employer agreed that the four-element test set out in Nance v. State Industries, Inc., 33 S.W.3d 222, 226 (Tenn. Workers' Comp. Panel 2000), controlled the disposition of the claim. The Employee and the Employer stipulated to the presence of three of the four elements identified in Nance as essential to bar recovery: that the Employer had in effect a policy requiring the Employee to wear protective gloves for safety purposes; that the Employer carried out strict, continuous, and bona-fide enforcement of the policy; and that the Employee had actual knowledge of the policy through his training program, including the danger involved in violating the policy. The central issue, therefore, was whether the Employee's removal of his gloves while in the performance of his duties qualified as a willful failure to use a safety appliance—the fourth element of the Nance test.

The Employee testified that he had worn his protective gloves when lifted in the bucket as he covered the "hot" lines on the lower pole with rubber blankets and hosing. Believing that he was in a "safe zone" and "clear" of the danger five feet below, he took off his gloves to hammer a metal staple, which was to secure a lightning arrestor into the crossarm of the new, taller pole. The Employee explained that it was easier to hammer without the gloves and, further, that he "didn't want to puncture a hole" in the gloves. After removing the gloves, he remembered being struck by a "ball of fire." The Employee concluded that the copper ground wire he was handling at the time must have come into contact with the transformer on the older, lower pole. He further testified that because he had removed his gloves under similar circumstances on previous occasions, he did not believe that he was exposing himself to danger.

On cross-examination, the Employee candidly acknowledged that the Employer's policy was that "any time from cradle to cradle, which is when the bucket closes, . . . you have to wear your rubber gloves if you're around anything hot . . . ." He admitted that when he was "around" the hot wires, the rule required him to wear his gloves for safety reasons. He further understood that the Employer's policy required leather gloves as an additional covering to guard against puncturing the rubber gloves. He agreed that his gloves were in

_____

[2] The employee manual provision requiring protective gloves for linemen working in the bucket lift or cradle is alternatively referred to in the record as "rule" and "policy."

perfect condition and that he should have kept them on as he attached the staple. The Employee conceded that his failure to do so violated the safety rules. When asked whether he could hammer the staples with the gloves on, he responded, "Yes, but it's hard." The Employee acknowledged that he had received a copy of the Employer's safety manual and had signed a receipt stating that it was his duty to "read, study, and abide by these safety rules and work procedures." He also testified that on the morning of the accident, he had been briefed by his foreman as to the equipment necessary for that day and had signed a form which provided that he understood his responsibility to wear protective equipment while performing the work. In his written notice of injury, the Employee again acknowledged that he was required to wear protective gloves and further admitted to the Employer that use of the gloves was an adequate means of avoiding injuries of this nature. His supervisor, who assisted in the preparation of the report, included the observation that protective gloves would have prevented the Employee's injuries.

Chuck Barnes, the safety coordinator and building maintenance supervisor for the Employer, confirmed that the Employer's policy required the Employee to wear protective gloves while installing a switch and lightning arrestors on a crossarm. He testified that a puncture of any kind required the immediate replacement of the gloves. He stated that the gloves provided by the Employer were designed to handle approximately 30,000 volts.

Britt Dye, the CEO and general manager for the Employer, explained that if a glove was punctured or damaged in any way, the policy of the Employer was to provide new gloves at no cost or penalty to the employee. Dye further stated that, as a result of the violation, the Employee was suspended for three days without compensation, demoted in pay, and reduced in position for six months. He pointed out that the other members of the Employee's crew were also disciplined for the violation.

The trial court awarded benefits to the Employee, finding that the Employee had not acted willfully, within the meaning of the law, because he had plausible explanations for the removal of his gloves:

> [R]emoving the gloves made it easier to staple. . . . It clearly was neither smart nor safe, but it did make it easier to staple. . . . [H]e did this in order to avoid puncturing the gloves, even though there certainly was in place a procedure that he could use to replace his punctured glove . . . . Further, I find that it is plausible that he believed that the pole he was working on was not hot. . . . So, respectfully, I'm going to find that the [Employee's conduct] was not willful within the meaning [of the] applicable case law.

The trial court awarded the Employee a vocational disability rating of 39% permanent partial

disability to the body as a whole—one and one-half times the 26% medical impairment rating to the body as a whole, observing that, "He's apparently a tough guy. He's back at work. He and the doctor worked together to make sure there were no restrictions. This is a profound injury. He has deformity on both of the hands. It's quite visible." In addition to an award of $117,312.00 for permanent partial disability, the trial court granted $23,462.40 in attorney's fees and $1,669.20 in discretionary costs.

The Employer appealed pursuant to Tennessee Code Annotated section 50-6-225(e)(3) and Tennessee Supreme Court Rule 51, arguing that the Employee's violation of an existing policy barred recovery. In the alternative, the Employer asserted that the trial court's award of permanent disability benefits was excessive. The case was referred to the Special Workers' Compensation Appeals Panel for a hearing and a report of findings of fact and conclusions of law. Following oral argument, but before the Panel rendered its decision, the case was transferred to the full Court for review. See Tenn. Sup. Ct. R. 51 § 2.

## II. Standard of Review
Initially, we are guided by well-established standards of review. Findings of fact by the trial court must be reviewed "de novo upon the record . . . accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. Code Ann. § 50-6-225(e)(2) (2008). This standard requires a careful examination of the factual findings and conclusions made by the trial court. Crew v. First Source Furniture Grp., 259 S.W.3d 656, 664 (Tenn. 2008) (quoting Galloway v. Memphis Drum Serv., 822 S.W.2d 584, 586 (Tenn. 1991)). When credibility and weight to be given testimony are at issue, considerable deference must be afforded the trial court when the trial judge had the opportunity to observe the witness' demeanor and to hear in-court testimony. Whirlpool Corp. v. Nakhoneinh, 69 S.W.3d 164, 167 (Tenn. 2002). No such deference is extended to a trial court's findings when reviewing documentary evidence, such as depositions. Orrick v. Bestway Trucking, Inc., 184 S.W.3d 211, 216 (Tenn. 2006).

Questions of law, however, must be reviewed de novo with no presumption of correctness. Layman v. Vanguard Contractors, Inc., 183 S.W.3d 310, 314 (Tenn. 2006). The interpretation and application of our workers' compensation statutes are questions of law. See Seiber v. Reeves Logging, 284 S.W.3d 294, 298 (Tenn. 2009). When construing statutes, our primary objective is to carry out the intent of the legislature without unduly broadening or restricting the statute. Arias v. Duro Standard Prods. Co., 303 S.W.3d 256, 260 (Tenn. 2010). This case involves an application of the law to facts not in dispute.

## III. Applicable Law
Our first workers' compensation laws, enacted in 1919, were designed to place on employers the burden of compensating workers for job-related injuries. Lynch v. City of

Jellico, 205 S.W.3d 384, 390 (Tenn. 2006); cf. Scott v. Nashville Bridge Co., 223 S.W. 844, 849 (Tenn. 1920) (observing that the purpose of workers' compensation law is "to secure to injured employ[ee]s reasonable compensation, so as to prevent them from becoming public charges"). Because of the remedial nature of the legislation, see Tenn. Code Ann. § 50-6-116 (2008), the statutes have been construed in a liberal manner so as "'to promote and adhere to the Act's purposes of securing benefits to those workers who fall within its coverage.'" Trosper v. Armstrong Wood Prods., Inc., 273 S.W.3d 598, 609 n.5 (Tenn. 2008) (quoting Martin v. Lear Corp., 90 S.W.3d 626, 629 (Tenn. 2002)). As stated in Betts v. Tom Wade Gin,

> this Court must interpret [the workers' compensation] statutes in a manner designed to protect workers and their families from the economic devastation that, in many instances, can follow on-the-job injuries. Furthermore, Tennessee's workers' compensation laws must be construed so as to ensure that injured employees are justly and appropriately reimbursed for debilitating injuries suffered in the course of service to the employer.

810 S.W.2d 140, 142-43 (Tenn.1991).

The Workers' Compensation Law creates a system in which employees can recover benefits for their injuries arising out of and in the course of employment without regard to fault. See Tenn. Code Ann. § 50-6-103(a) (2008). There are, however, some circumstances in which an employee cannot recover for injuries that would otherwise be compensable. In this instance, the Employer contends that the trial court erred by awarding benefits because claims of this nature are barred by Tennessee Code Annotated section 50-6-110(a), which provided, at the time of the accident, in pertinent part: "No compensation shall be allowed for an injury or death due to the employee's willful misconduct or intentional self-inflicted injury, due to intoxication or illegal drug usage, or willful failure or refusal to use a safety appliance or perform a duty required by law."[3] The burden of proof is on the employer to

---

[3] Later in 2009, Tennessee Code Annotated section 50-6-110(a) was amended to provide as follows:

(a) No compensation shall be allowed for an injury or death due to:
    (1) The employee's willful misconduct;
    (2) The employee's intentional self-inflicted injury;
    (3) The employee's intoxication or illegal drug usage;
    (4) The employee's willful failure or refusal to use a safety device;
    (5) The employee's willful failure to perform a duty required by law; or
    (6) The employee's voluntary participation in recreational, social, athletic or exercise activities, including, but not limited to, athletic events, competitions, parties, picnics, or
(continued...)

demonstrate that the willful misconduct or the willful failure to use a safety appliance was the proximate cause of the injuries. Tenn. Code Ann. § 50-6-110(b); Coleman v. Coker, 321 S.W.2d 540, 542 (Tenn. 1959) (explaining that the employer must "show that the injury was due to the willful misconduct of the employee"); see also Overall v. S. Subaru Star, Inc., 545 S.W.2d 1, 4 (Tenn. 1976) (stating, in the context of the same workers' compensation provision, that when a statute uses the language "due to," this refers to proximate cause).

### A. Willful Misconduct

In order to successfully defend a workers' compensation claim on the basis of willful misconduct under the terms of Tennessee Code Annotated section 50-6-110(a), this Court held twenty years ago that an employer must establish (1) that the employee intended to commit the act, (2) that the employee purposefully violated orders, and (3) that an element of perverseness existed in the performance of the act. Rogers v. Kroger Co., 832 S.W.2d 538, 541 (Tenn. 1992) (holding that the employee's intentional horseplay in violation of workplace rules barred recovery for an injury). This three-part test was first announced in Insurance Co. of America v. Hogsett, 486 S.W.2d 730, 733 (Tenn. 1972). The language of the relevant workers' compensation statute—at that time, Tennessee Code Annotated section 50-910—was the same as the controlling version of the statute at issue here, Tennessee Code Annotated section 50-6-110(a): "[n]o compensation shall be allowed for an injury . . . due to the employee's willful misconduct . . . ." Hogsett, 486 S.W.2d at 732. In Hogsett, an employee's teeth were knocked out when he "goosed" a co-worker in the ribs five minutes after being told not to do so, causing the co-worker to strike the employee in the face with a bottle. Hogsett, 486 S.W.2d at 731. While denying the employee's claim because of his willful misconduct, the Court stated as follows: "we are of the opinion the employer has shown the three elements, as deduced from the opinions of this Court, constituting willful misconduct as contemplated by the statute and they are: (1) an intention to do the act, (2) purposeful violation of orders, and (3) an element of perversiveness." Id. at 733. In formulating the willful misconduct test, the Court drew upon Coleman, 321 S.W.2d at 542 (upholding a grant of benefits and observing that willful meant that "regardless of what an employee is told he goes on 'hellbent for election' anyhow"), and Brown v. Birmingham Nurseries, 117 S.W.2d 739, 740 (Tenn. 1938) (holding that an employee's purposeful violation of established safety rules, despite instruction and warning, constituted willful misconduct).

---

[3](...continued)
exercise programs, whether or not the employer pays some or all of the costs of the activities
. . . .

Tenn. Code Ann. § 50-6-110(a) (Supp. 2009).

In both Coleman and Brown, the Court indicated that the willful misconduct defense was intended to preclude recovery for intentional violations of established rules or policies. Application of the defense depended upon the circumstances. In Brown, this Court observed that "[w]il[l]ful misconduct connotes intentional misconduct, purposeful violations of established rules of safety and orders for protection from danger." Brown, 117 S.W.2d at 739. The Court pointed out that an "intentional disregard of specific instructions" as opposed to an "intention to bring about [an] injury," would bar an award of benefits. Id. at 740; see also Ezell v. Tipton, 264 S.W. 355, 358 (Tenn. 1924) ("'Willfully' means intentionally; that is, the person doing the act intended at the time to perform that act."). In Coleman, the Court ruled that willful misconduct involved the "intention[al], purposeful, violation of orders," but rejected the defense because "no such precise order [had been] given" by the employer. Coleman, 321 S.W.2d at 542-43. These early cases provide the foundation for the test outlined in Hogsett, illustrating that for the willful misconduct defense to apply, an employee must have intentionally broken the employer's rules or violated its orders—the first two prongs of the willful misconduct test set out in Rogers.

Our research suggests that the willful misconduct defense has been successful only when the employer has been able to conclusively establish that the employee deliberately and intentionally violated known and strictly enforced policies "designed to preserve the employee from serious bodily harm." Bryan v. Paramount Packaging Corp., 677 S.W.2d 453, 455 (Tenn. 1984) (observing that "disobedience of a 'rule' is not willful misconduct where the 'rule' is habitually disregarded with the knowledge and acquiescence of the employer"); see also 2 Lex K. Larson, Larson's Workers' Compensation Law § 34.01 (Matthew Bender, rev. ed.) [hereinafter Larson's] (stating that practically every case involving a successful willful misconduct defense "would also have succeeded under a statute making wil[l]ful violation of safety regulations a defense"). To illustrate, in Wright v. Gunther Nash Mining Construction Co., 614 S.W.2d 796, 797 (Tenn. 1981), a miner fell to his death while descending into a mine shaft by sliding down the cable rather than using a bucket. Observing that the term willful misconduct had been limited in application to only "the most extreme situations" involving the "willful disobedience to known and understood prohibitions," the Court awarded benefits, holding that the employee's actions, while reckless, were in furtherance of his employer's interests, could not be said "to have been beyond contemplation," and were not prohibited by rule or policy. Id. at 798-800.

When an employee knows of a rule or policy and purposefully violates its terms, the first two of the Rogers prongs—an intention to commit the act and a purposeful violation of orders—have been satisfied. See, e.g., Rogers, 832 S.W.2d at 541; Loy v. N. Bros. Co., 787 S.W.2d 916, 920 (Tenn. 1990) (declining to find willful misconduct where it was not proven that the employee's violation was "deliberate"). As pointed out in a recent Panel opinion, the third prong in Rogers—whether an element of "perverseness" exists—has not been

-8-

consistently defined. See Davidson v. Bus. Pers. Solutions, No. E2010-02366-WC-R3-WC, 2011 WL 6180846, at *4 n.4 (Tenn. Workers' Comp. Panel Dec. 12, 2011). The term perverseness first appeared in the workers' compensation context in American Mutual Liability Insurance Co. v. Gart, 125 S.W.2d 140, 141 (Tenn. 1939), where the Court, while upholding an award of benefits for an employee who was burned to death in a boiler after failing to wait the requisite twenty-four hours for cooling, observed that "[n]ot only does wil[l]ful connote intentional, purposeful violation of orders . . . but also an element of perverseness." In Gart, this Court observed that the "pertinent distinction[]" in instances where willful misconduct existed was that the "employee was motivated by self interest," whereas there was no misconduct when the employee "committ[ed] an error of judgment, in what he regarded as the . . . interest of his employer." Id. at 141-42. A Panel opinion has equated perverseness with being "obstinate or petulant." Neely v. Federated Rural Elec. Ins. Corp., No. 03S01-9410-CH-00099, 1995 WL 595598, at *4 (Tenn. Workers' Comp. Panel Aug. 21, 1995) (holding that a rule requiring linemen "to give consideration to lines which are energized" did not bar recovery for a lineman injured when he hurriedly climbed a pole with a downed line to ascertain the problem and restore service).

The Larson's treatise has criticized the general concept of willful misconduct as a defense, commenting that "[t]he most impressive thing about the defense is the variety of situations in which it has not succeeded," Larson's § 34.02, and observing that only one-third of the states recognize it as a defense. Id. § 34.01. A further observation is that application of the concept is rare:

> The other reason for the relative unimportance of the defense is that its application has been nothing like as broad as the term itself might lead one to expect. After all, "wil[l]ful misconduct" could mean almost anything. But an analysis of the cases shows that the defense has been generally successful in only one narrow field, that of intentional violation of safety regulations. It would not be much wide of the mark to say that every case in which the wil[l]ful misconduct defense succeeded would also have succeeded under a statute making wil[l]ful violation of safety regulations a defense.

Id. (emphasis added).

Of course, the right to workers' compensation benefits is entirely statutory, Curtis v. G.E. Capital Modular Space, 155 S.W.3d 877, 882 (Tenn. 2005), and the legislature is solely responsible for creating the workers' compensation program, including the willful misconduct defense, see Aerosol Corp. of the S. v. Johnson, 435 S.W.2d 832, 836 (Tenn. 1968). As such, any changes in the workers' compensation program must come from the legislature, not the courts. Lindsey v. Hunt, 387 S.W.2d 344, 345 (Tenn. 1965).

**B. Willful Failure or Refusal to Use a Safety Appliance**

In Nance, a Special Workers' Compensation Panel fashioned a test for the more specific statutory defense—"willful failure or refusal to use a safety appliance," Tenn. Code Ann. § 50-6-110(a). Nance, despite being trained by his employer to use a safety device while cleaning heavy machinery as required by safety regulations, never used the device. Nance, 33 S.W.3d at 227-28. The Panel ruling identified four elements the employer must establish in order to avoid the payment of benefits under the statute:

> (1) at the time of the injury the employer had in effect a policy requiring the employee's use of a particular safety appliance; (2) the employer carried out strict, continuous and bona fide enforcement of the policy; (3) the employee had actual knowledge of the policy, including a knowledge of the danger involved in its violation, through training provided by the employer; and (4) the employee willfully and intentionally failed or refused to follow the established policy requiring use of the safety appliance.

Id. at 226.

The Panel found that Nance did, in fact, willfully violate the company safety policy requiring the use of a safety device—the fourth element: "Nance has not presented any legitimate, plausible, or reasonable excuse for his consistent violations of . . . mandatory company policy." Id. at 229.[4] In its analysis as to this fourth element, the Panel made the following observations: "In evaluating whether the employee's conduct was willful . . . the court must distinguish between those cases in which the employee's conduct was accidental, negligent, inadvertent, thoughtless, an error of judgment, or even reckless, and those cases in which the conduct was willful." Id. at 226. Explaining that the term willful "must be construed consistently with its use in the more general defense of 'willful misconduct,'" id., the Panel made specific reference to the three essential elements for the general willful misconduct defense set out in Rogers, 832 S.W.2d at 541, as guidance in the analysis and further commented as follows:

> [T]he Court must determine whether there is a plausible explanation for the employee's failure or refusal to use the safety appliance. For example, if the proof shows that the employee was not using the safety device because it was inadequate or defective, the employee should not be barred from receiving the

---

[4] Because, however, the employer had failed to establish "strict, continuous and bona fide enforcement of the established policy," the second of the elements required for the defense, the Panel remanded the case to the trial court for further consideration of that particular issue. Id.

benefits to which he or she would otherwise be entitled. If there is a plausible explanation for the employee's failure or refusal to use a safety appliance, the employee's conduct cannot be found to have included "an element of perverseness" and consequently cannot be found to have been "willful."

Nance, 33 S.W.3d at 227 (citations omitted). The holding in Nance illustrates a close relationship between willful misconduct and willful failure or refusal to use a safety appliance. Moreover, in Durant v. Saturn Corp., No. M2003-00566-SC-WCM-CV, 2004 WL 941012, at *7 (Tenn. Workers' Comp. Panel Apr. 30, 2004), where the employer alleged willful misconduct as a defense, the Panel commented that although "[t]he case at hand does not involve a willful failure or refusal to use a safety appliance, . . . the court's reasoning [in Nance] in applying these four elements is instructive."

### C. Uniform Approach to Willful Misconduct and Willful Failure or Refusal to Use Safety Appliance

The Larson's treatise also recognizes the blurred line between the statutory defenses of willful misconduct and the willful failure or refusal to follow a safety regulation or policy: "If the [willful misconduct] defense is indeed to amount to no more in practice than a violation-of-safety-regulation defense, it would be much better to say so in plain language and put an end to the litigation inspired by the vague breadth of the phrase 'wil[l]ful misconduct.'" Larson's § 34.02. Because of this overlap, Larson's observes that "[t]he legal issues under the 'wil[l]ful misconduct' defense are almost all the same as under the 'wil[l]ful violation of safety regulation' defense," except that under the more general willful misconduct theory, it must first be determined whether a particular violation is the very type of misconduct contemplated by the statutory defense. Id. § 34.03.[5] Larson's suggests that

---

[5] Larson's outlines the following illustrations for "the kinds of excuses which have been accepted for rule-violation or failure to use safety devices":

A painter, required to use a respirator inside the car he was painting, found that the respirator was defective and went ahead without it. Here was an act that was reckless in the extreme. Yet the failure to use the respirator was not because of wil[l]ful misconduct but because of breakdown of the safety device. Removal of goggles had been held excusable when an employee, working in an excavation where light was poor, momentarily lifted them the better to give directions to a crane operator, and when an employee, required to work on a narrow plank 80 feet above ground, removed his goggles because the opaque side-pieces blocked his side-vision and increased the danger of falling. But mere discomfort, or frequent steaming-up has been held insufficient reason for pocketing safety goggles. Removal of guards on machines has been excused when the purpose was to enable a laundry employee to run a nurse's cap through a collar machine which was otherwise too narrow, and when the purpose was to clean a machine rather than operate it. But removal of a

(continued...)

-11-

the elements required to assert successful defenses for willful misconduct, willful disobedience of safety rules, or willful failure to use a safety device should be determined by the same standard: (1) the employee's actual, as opposed to constructive, notice of the rule, id. § 35.02 ("One cannot deliberately break a rule unless one in fact knows the rule exists."); (2) the employee's understanding of the danger involved in violating the rule, id. § 35.02 ("[W]il[l]fulness connotes . . . that the employee understand the rule and realize that the device involved is . . . a safety device to guard against a danger which has been explained in advance."); (3) the employer's bona fide enforcement of the rule, id. § 35.03 ("The most frequent ground for rejecting violation of rules as a defense . . . is the lack of enforcement of the rule in practice."); and (4) the employee's lack of a valid excuse for violating the rule, id. § 35.04 ("If the employee had some plausible purpose to explain a violation of the rule, the defenses of violation of safety rules or wil[l]ful misconduct are inapplicable . . . ."). Id. § 35 Scope. The first three elements, by our reading, are identical to those set out in Nance, and the fourth is similar, abandoning, however, the use of "perverseness" as a consideration in the analysis of the term "willful."

Several other jurisdictions have adopted this test in an effort to develop more consistency in the results of cases involving possible employee willful misconduct. See, e.g., Guico v. Excel Corp., 619 N.W.2d 470, 476-77 (Neb. 2000) (using the Larson's test to analyze "willful negligence," defined as "a deliberate act knowingly done or at least such conduct as evidences a reckless indifference to the employee's own safety"); Holscher v. Valley Queen Cheese Factory, 2006 SD 35, ¶ 49, 713 N.W.2d 555, 568-69 (S.D. 2006) (stating that the test outlined in Larson's is used "to determine whether an employee's violation of workplace safety rules constitutes willful misconduct"); Saunders v. Indus. Comm'n, 705 N.E.2d 103, 106 (Ill. App. Ct. 1998) (relying on Larson's for the propositions that: deliberately breaking a rule requires knowledge of the rule; lack of enforcement frequently thwarts the defense of a safety rule violation; and willfulness may be negated when an employee provides a plausible purpose for violating a safety rule); see also Spaulding v. Alliant Foodservice, Inc., 689 N.W.2d 593, 603 (Neb. Ct. App. 2004). Because Larson's four-step test establishes straightforward guidelines for evaluating claims of willful misconduct and the willful failure or refusal to use a safety appliance, we choose to adopt the standard for this and future cases involving these statutory defenses.

---

[5](...continued)
similar guard to speed up operation of a machine, or violation of an order solely to make the claimant's own job easier, is not accepted as justification for violation of safety rules or omission to utilize safety devices, since after all, most safety rules and safety devices do entail some inconvenience, discomfort, or loss of speed as the price of increased safety of operation.

Larson's § 35.04 (footnotes omitted).

**D. Analysis**

Under either the rule established in <u>Nance</u> or the standard suggested by <u>Larson's</u>, the resolution of the specific issue before us depends entirely upon the fourth element: whether the Employee had "a plausible explanation" for his failure to follow the requirement to wear protective gloves, <u>Nance</u>, 33 S.W.3d at 227, which would qualify as a "valid excuse" for violating the rule. <u>Larson's</u> §§ 35.04 & 35 Scope.

Over seventy years ago, this Court addressed almost identical circumstances in <u>Cordell v. Kentucky-Tennessee Light & Power Co.</u>, 121 S.W.2d 970 (Tenn. 1938). Cordell, a lineman, suffered an electrical shock while working on a pole, causing severe injuries to his arm and shoulder, which ultimately contributed to his death. <u>Id.</u> at 970. The employer had furnished Cordell with safety appliances, including rubber gloves and sleeves, and a rubber hose and blanket designed to insulate energized wires as he climbed a pole. <u>Id.</u> Because Cordell was aware of the rules, knew that the employer vigorously insisted upon compliance, and nonetheless failed to utilize his safety equipment, this Court denied his claim:

> The company had resorted to every conceivable means to impress upon its employees the necessity of using these safety appliances which it had provided for their protection. We can think of nothing more that the company could have done to safeguard its employees than was done in this cause. Therefore, where the employee, with full knowledge of the danger and a familiarity with the safety rules, disregards same, takes a chance and is injured, his conduct within the meaning of the statute is willful and no recovery can be had.

<u>Id.</u> at 972.

Although there are cases, under similar circumstances, in which recovery has been allowed,[6] our research suggests that a majority of the courts addressing the issue have found that a lineman does not typically have a valid excuse to dispense with the use of protective gloves when working with or around energized lines where a safety rule specifically prohibits such behavior. In <u>Great Western Power Co. v. Pillsbury</u>, 149 P. 35, 39 (Cal. 1915), for example, an experienced lineman was electrocuted while removing a transformer. While fully aware of a rule requiring the use of protective gloves and having been reminded by the

---

[6] For example, in <u>City of Las Animas v. Maupin</u>, 804 P.2d 285, 285 (Colo. App. 1990), an employee removed one of the rubber gloves he was required to wear while working on power lines. The employer's safety violation defense was held to be inapplicable because the employee held a valid belief that he could not operate certain machinery with the glove on and under normal conditions, operating the equipment without a glove on would not pose a safety threat. <u>Id.</u> at 286.

job foreman of the requirement just before his fatal accident, the lineman chose to proceed without his gloves.  Id.  In denying workers' compensation benefits based on its finding of willful misconduct, the California Supreme Court adopted the language of the dissenting opinion of its intermediate court:

> It was the duty of the deceased to obey [the rule].  It was a deliberate breach of his duty to disobey it.  The rule was made and the equipment was supplied to safeguard workmen against unforeseen and hidden dangers such as caused the death of the employ[ee] here.
>
> . . . .
>
> The deceased was a lineman of seasoned experience.  The risks of his employment were known to him.  He was not only recently advised of, but was perfectly familiar with, the necessity of taking the prescribed precaution by using the gloves in the work in which he lost his life.  To my mind his misconduct manifested a wanton indifference and a willful disregard of all caution and precaution.

Id. at 39-40 (internal quotation marks omitted); see also Mills v. Va. Elec. & Power Co., 90 S.E.2d 124, 127 (Va. 1955) (holding that willful misconduct on the part of a lineman working around energized wires precluded recovery where "[the employee] knew of and violated the reasonable rule that required him to wear rubber gloves for his own safety"). More recently, in Spruill v. C.W. Wright Construction Co., 381 S.E.2d 359, 360-61 (Va. Ct. App. 1989), a Virginia court, while recognizing the misconduct defense, ruled that a lineman had a valid excuse for his failure to wear protective gloves and granted recovery.  The court observed that the employee could "hardly be said to have willfully disregarded a safety rule applicable only to live wires" when he affirmatively believed the line was dead.  Id. at 361 (emphasis added).

In this instance, the established policy, clear and unequivocal, was known to the Employee.  As stipulated, the Employee, having nine years of experience, understood the rationale for wearing protective gloves, fully appreciated the danger involved in a violation, and conceded that the rule was enforced.  His admission that he knew the safety policy required protective gloves while in the bucket lift and his acknowledgment that he elected to take them off anyway clearly established that his act was willful—and not merely negligent or reckless.  It is undisputed, therefore, that the Employer satisfied each of the first three elements of the defense.  Moreover, convenience to the Employee does not qualify as a valid excuse.  The explanation that he saved time or found it easier to apply the staple without the gloves does not qualify as a plausible explanation.  See Gart, 125 S.W.2d at 141

-14-

(stating that where an employee considers "his own comfort and convenience exclusively . . . [t]his . . . tend[s] to sustain the view that his misconduct was wil[l]ful"); cf. Auto Lite Battery Corp. v. Indus. Accident Comm'n, 176 P.2d 62, 63-64 (Cal. Dist. Ct. App. 1947) (affirming the Commission's decision reducing an award of benefits where the employee violated a rule by transporting materials using a vehicle rather than carrying them by hand); Larson's § 35.04 ("[A]fter all, most safety rules and safety devices do entail some inconvenience, discomfort, or loss of speed as the price of increased safety of operation."). Similarly, in light of the Employer's policy of immediately replacing damaged gloves at no cost or penalty to the Employee, the Employee's explanation that he removed his gloves to prevent possible damage is likewise invalid. Unlike the policy in Spruill, which required protective gloves only when employees worked on live wires and the employee believed the wires were not energized, the rule here required gloves "cradle to cradle," and the Employee, while holding wiring to attach to a new pole, candidly acknowledged his awareness of the energized, older pole just five feet below his area of work. The lack of a valid excuse for the failure to use a safety appliance or device, when the first three elements have been satisfied, amounts to willfulness. In this instance, the Employee's willful failure to use his protective gloves constituted the proximate cause of his injuries. The Employer has, therefore, met its burden to prove the fourth element. The evidence preponderates against the finding of the trial court that the Employee's conduct "was not willful within the meaning of the . . . law."

## Conclusion

Because the Employee knew and understood the rationale for a clearly stated, strictly enforced safety policy, and because he did not have a valid excuse for his failure to make use of his protective gloves in these circumstances, the judgment of the trial court awarding benefits to the Employee is reversed and the cause is dismissed. Costs are adjudged against the Employee, for which execution may issue if necessary.

_____
GARY R. WADE, JUSTICE

-15-