**FILED**
**Feb 19, 2025**
**10:30 AM(CT)**
**TENNESSEE**
**WORKERS' COMPENSATION**
**APPEALS BOARD**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| William Markin | ) Docket No.    2023-08-7648 |
| | ) |
| v. | ) State File No.  4916-2023 |
| | ) |
| Memphis Light, Gas | ) |
| & Water Division, et al. | ) |
| | ) |
| | ) |
| Appeal from the Court of Workers' | ) Heard January 21, 2025 |
| Compensation Claims | ) in Jackson, Tennessee |
| Allen Phillips, Judge | ) |

---

### Affirmed and Remanded

---

In this interlocutory appeal, the employer contends the trial court erred when it found that the employee would likely prevail at trial in his request for medical benefits resulting from a welding accident. The employer had denied the claim, asserting willful misconduct and failure to wear a safety device as defenses, but the trial court concluded the employer had not presented sufficient evidence of these affirmative defenses to support a conclusion that the employee was unlikely to prevail at trial. Employer has appealed. After careful consideration of the record and of arguments of counsel, we affirm the trial court's order and remand the case.

Judge Pele I. Godkin delivered the opinion of the Appeals Board in which Presiding Judge Timothy W. Conner and Judge Meredith B. Weaver joined.

Casey Shannon and Noor Obaji, Memphis, Tennessee, for the employer-appellant, Memphis Light, Gas & Water Division

Monica Rejaei, Memphis, Tennessee, for the employee-appellee, William Markin

### Factual and Procedural Background

On January 17, 2023, William Markin ("Employee") was employed as a commercial gas welder for Memphis Light, Gas & Water ("Employer") when a gas explosion caused a serious injury to his right eye. Employee was working as part of a three-man team that included Employee; co-worker and welder, Robert Diffee ("Diffee"); and acting crew leader, Danny Daniels ("Daniels"). The team was dispatched to install a meter in the north

1

part of Memphis.  When they arrived, however, the site was not ready for the installation. After calling dispatch, they were sent to another location in the south part of Memphis so they could remove a different meter, but, upon arrival, the meter had already been removed. The crew contacted dispatch again and were told to close out the work order, go to lunch, and then begin welding parts they would need for their next job.  They returned to north Memphis and, following lunch, drove to an empty lot on Benjestown Road, where the crew parked.  Diffee was driving the vehicle and Daniels was sitting on the passenger side. Employee was sitting in the back seat of the truck on the driver's side.

The subject accident is alleged to have occurred when Daniels left the vehicle and began welding without notifying his team members.  According to Daniels, Employee and Diffee had been ribbing him about being a crew leader and no longer having to weld. Daniels testified that after they stopped at the empty lot, he exited the vehicle from the front passenger door, went to the back of the truck, and prepared the various parts for welding.  When he lit the welding torch, it immediately sparked an explosion.  Daniels testified that he did not know Employee's or Diffee's locations when he lit the torch.

Diffee stated he was on the phone with his wife when the team arrived at the empty lot.  While still on the phone, he exited the vehicle from the driver's side and walked toward the back of the truck, placing an empty and uncapped Gatorade bottle from his lunch on the rear of the truck beneath the two hose reels on the back passenger side of the truck. Diffee noted it was "extremely common" for them to keep a bottle or cup available to pour water on welded pieces to cool them down.  After placing the Gatorade bottle on the rear of the truck, he returned to the front passenger side of the truck to put his phone away and retrieve his work gloves from the floorboard.  While he was walking from the front of the truck to the back of the truck, he heard the explosion and saw a "white flash" but was not sure what happened or what had caused the explosion.  After the explosion, Diffee noted the Gatorade bottle was no longer on the back of the truck and there was a "scorch mark" where the bottle had been sitting.  Daniels stated that he did not know what happened, but he believed acetylene gas from the welding torch hose may have collected inside the bottle, causing the bottle to explode when the welding torch was lit.

Employee stated that, when they arrived at the empty lot, he was on the telephone with his significant other, so he remained in the back seat on the driver's side of the vehicle. He then explained what happened after he ended the call:

> I got out [of the truck] to see what the – plan for the – the job was.  And so I walked around to see what – you know, what our plan was, and I was unaware that the – the crew had [begun] working.  And I got near the – the back of the truck and it was lights out.

Employee related, and his co-workers verified, that there had been no meeting to prepare for the job and that Daniels did not tell the others when he was beginning to weld.

2

Employee stated he did not hear the work beginning while he was inside the truck on his phone. Employee recalled the only person he saw at the back of the truck was Daniels and the explosion happened "within seconds" of his seeing the torch in Daniels's hand. Employee was not wearing any personal protective equipment ("PPE"), including his safety glasses, at the time of the explosion and gave conflicting accounts of whether he was holding his glasses at that time or if the glasses were located in a bin in the back of the truck. Employee testified he had no idea that Diffee had placed a plastic bottle in the back of the truck until the company began investigating the accident.

Following the incident, Daniels and Diffee, who were both uninjured except for a cut to Daniels's lip, transported Employee to the emergency room at Regional One Health for a traumatic eye injury as a result of the explosion. The medical records reflect that the mechanism of injury was "welding and explosion during welding." Employee sustained lacerations to his left temple, both arms, and right eye. The description of the incident contained in the emergency room records reflect that Employee was a "25 [year old white male] who was welding when a bottle exploded[,] and his eye was lacerated. H[e] received lacerations to the left temple and bilateral forearms as well." Employee ultimately lost his right eye and received a prosthetic eye, after which he had additional medical care for complications related to the prosthetic eye.[1] Medical records prepared throughout the course of Employee's treatment reflect that Employee was injured when a container exploded near him as he exited a work truck.

*Employer's Investigation*

Employer began its investigation on the day of the accident. Mark Ward ("Ward"), Employer's supervisor of corporate safety, was tasked with investigating the accident. As part of the investigation, Daniels provided a written statement on January 17, the day of the accident, indicating that the incident had occurred on Elvis Presley Boulevard, not Benjestown Road. He stated he believed that, because one of the tanks of gas feeding the torch had been left on, "the bottle that was sitting on the back of the truck got filled up from the torch." While examining the truck, Ward observed the "scorch mark" the welding crew believed was left after the bottle apparently exploded. He then examined the Elvis Presley Boulevard location but found no evidence of an explosion. He questioned Daniels again regarding the location of the accident, and Daniels told him the explosion occurred behind the building. The next day, January 18, Daniels admitted he had lied about the location of the accident and told Ward that the incident actually happened in the empty lot at Benjestown Road. He provided a second written statement in which he indicated he heard a "boom" near where the bottle was sitting when he lit the torch. Daniels stated he had "no clue" what happened, but he speculated that the bottle filled with acetylene and lighting his welding torch "made that area and the bottle explode."

---

[1] Employee's injuries are not at issue in this appeal. Thus, we forego an in-depth discussion of the extent and nature of Employee's injuries and subsequent medical treatment.

3

On January 19, Daniels provided a recorded statement. He noted that the crew chose the Benjestown Road location because it was a good area to weld, although he himself had never used it as a location to weld and had only driven by the location previously. Daniels stated he did not see the bottle when he was preparing to weld, and he acknowledged that he did not, on that day or as a matter of practice, conduct safety briefings or meetings at job sites before starting work. He also stated he did not know where Employee or Diffee was located when he began welding. Daniels also provided a statement to TOSHA that indicated he was working on the bench "right underneath" the reel, and the top reel hose was on because the tanks had been changed three days before the incident.[2]

As part of the investigation, Diffee also provided a statement indicating that he often saved empty beverage bottles so they could be filled with water for cooling parts during welding, which he indicated was a standard practice among the welders. After the incident occurred, Diffee "rolled the hose up [and] turned the torch off before we left [for the hospital]." While doing so, he noted that the tip of the torch "pointed straight down" toward where the bottle had been sitting. Diffee indicated his belief that the welding torch's position relative to the empty bottle coupled with the free flow of oxygen and acetylene caused the bottle to fill with combustible gas and then explode when the welding torch was lit.

Employee's statement reflects that he has little memory of the relevant events of that day. He was able to recall some medical treatment he received in the emergency room but could not remember what happened on the way there, stating that everything was "a blur." He acknowledged that he did not know where his co-workers were at the time of the explosion and that he was not wearing his safety glasses at the time of the accident, explaining that he did not know the work had begun.

At the conclusion of its investigation, Employer issued a report in which it noted Daniels failed to conduct safety briefings, failed to protect his work crew, and committed other company safety violations. Although Employer's report recommended corrective action, it did not include any suggestion that the incident was due to horseplay. TOSHA also investigated the incident, after which it cited Employer with a "serious violation" because Employee was not wearing eye protection. Its report did not mention horseplay.

Employer, during its internal investigation, found a bottle at the Benjestown Road location that looked like it had exploded, and Employer believed that this bottle was the one that injured Employee. Employer later found three additional bottles in the same condition at that location.[3] During his effort to recreate how the accident may have

---

[2] The record contains some references to a practice of leaving such a hose in the "on" position for newly filled tanks in an effort to relieve pressure inside the hose.

[3] These bottles were found approximately two months after the incident. There is no evidence in the record connecting these bottles to this incident or to the members of this welding team. There is no evidence in

4

occurred, Ward made a video to demonstrate how a bottle filled with acetylene and oxygen is damaged when ignited by a welding torch. He concluded that the result of his experiment accurately replicated the condition of the bottles found at the Benjestown Road location. As a result of his experiments, Ward determined that the explosion was most likely caused by Employee and one or both other crew members *intentionally* filling the Gatorade bottle with flammable gas then igniting it. In a supplemental declaration, and in response to Diffee's claim that the hose from a torch was leaking or blowing acetylene and oxygen into the bottle, Ward stated there "was no way the hose was leaking [a]cetylene" into the bottle because acetylene is lighter than air and, for that reason, would "dissipate" out of an empty uncapped bottle. Ward performed four separate experiments in an effort to recreate the incident and concluded that an explosion "occurred consistently" only when an ignition source was very close to a bottle that was intentionally filled with acetylene and oxygen. It was also Ward's belief that someone could only "be injured from these explosions if they were no more than an arm's length from the Gatorade bottle." Finally, Ward noted "the wind was blowing at 6.7 mph" that day, and he opined that a Gatorade bottle cannot remain upright and spontaneously fill up with a mixture of oxygen and acetylene in such conditions. Thus, he concluded "this was an intentional non-work-related act of horseplay." As a result of this investigation, Employer stopped paying benefits and later terminated Employee and Daniels for misconduct.

*Testimony at Expedited Hearing*

During the expedited hearing, Employee testified that he always used safety equipment, explaining that, "when welding[,] . . . we must wear Shade 5 welding glasses, welding gloves, and any other PPE for that jobsite." He noted that Diffee was driving, Daniels was in the front passenger seat, and he was sitting in the back seat behind the driver when they arrived. Employee was the last person out of the vehicle and testified that he did not know Daniels had started welding because no one had said anything. He stated it was common for the crew to pre-weld at different locations, and they went to the isolated lot on Benjestown Road because it was safer. Employee denied that he or any other member of his crew was engaged in horseplay or intentionally blew up Gatorade bottles. Employee also denied that he made any statements to medical providers at the emergency room suggesting he was the one welding at the time of the explosion.

Diffee testified that he put the bottle at the rear of the truck and confirmed there was black soot in that spot after the explosion. He stated he was not wearing PPE at that point because he had not started working. Diffee denied intentionally blowing up bottles and testified, "[n]ever in my life would I ever do anything to not only endanger myself, but to endanger people that I care about that have children, that have families. That's absolutely

---

the record that these bottles underwent any type of testing. Employer admitted it is no longer in possession of these bottles, as they were inadvertently thrown away by cleaning staff. There is no evidence that Employee was afforded an opportunity to examine the bottles.

5

not in no shape, way, form, or fashion [what happened]." In response to Employer's argument that acetylene is lighter than oxygen and, therefore, the incident could not have occurred the way Diffee said it did, he stated that he believed Ward's video *supported* his theory of what happened that day, stating

> [a]cetylene comes out of that torch at 10 PSI. It's going to travel quite a distance before it becomes unaffected by that PSI and becomes lighter than air. So, sure, it's lighter than air, but if it's going down, . . . and there's some time to create a confined space – the bottle – it doesn't have to be pointed directly at it, whatever. That acetylene is coming out at 10 PSI. It's traveling quite a bit of distance before it becomes lighter than air, and it's collecting in the bottle because it's just constantly coming out of that torch that [Daniels] was unaware of.

Diffee went on to testify that he was "made to feel like I was dumb for even saying it was – it was a freak accident or – you know, they were just instantly telling me that, 'Oh, we – you were horseplaying.'" He reiterated that he believed it was a "freak accident" and that he understood the "basic physics of a gas that's lighter than air, but it has 10 pounds of pressure forcing it down until it explodes." Diffee testified that he resigned in 2024 due to the handling of the investigation and the way he was treated after he returned to work.

Daniels also testified during the expedited hearing, stating he did not intentionally blow up a Gatorade bottle that day and did not engage in any kind of horseplay. He confirmed he was the individual performing the welding at the time the incident occurred and testified that "[w]hen I started the torch is when [the explosion] happened." Daniels said the explosion happened "immediately" after the welding torch was lit.

Ward testified for Employer and stated that the description of the incident given by Employee and his co-workers did not make sense, so he researched "acetylene bombs" on YouTube and found them "all over the place." He testified to finding videos about how to make acetylene bombs and attempted to recreate what the crew said occurred with the Gatorade bottle. He testified to the specific gravity of acetylene as well as that of air and oxygen and restated that, in his opinion, what the men described "didn't happen." However, Ward acknowledged that he is not an expert or an accident reconstructionist. Moreover, during this hearing, Employer made no effort to qualify Ward as an expert under Tennessee Rule of Evidence 702.

Joshua Davis ("Davis"), Manager of Corporate Investigations and Loss Prevention for Employer, testified that he noted inconsistencies between Employee's, Davis's, and Diffee's accounts of where the incident occurred, where each man was at the time of the incident, and whether Employee was the individual welding. He stated that, on March 21, 2023, approximately two months after the incident, he discovered three water bottles in a ditch next to where the truck was purportedly parked at the Benjestown Road location. All

6

three bottles were in the same condition as the one Ward found the day after the incident. Davis also testified that, when he placed an empty Gatorade bottle on the back of a truck in the same wind conditions as existed on the day of the accident, the bottle blew over four times. He testified that he believed it was "impossible" to recreate the explosion exactly as the crew said it happened, although, ultimately, he acknowledged he could not say "for certain" that the explosion was intentional.

*Expedited Hearing Order*

In its September 10, 2024 order, the trial court concluded Employer had not produced sufficient evidence to support its affirmative defense alleging that Employee failed to wear appropriate PPE by noting that Employer did not offer any evidence of bona fide enforcement of the rule, which is an essential element of the defense. The court also found that Employer's theory of the accident, upon which it relied to support its willful misconduct defense, was based on "supposition, circumstantial evidence, and what [Ward] called common sense. That common sense led him to believe that the accident could not have occurred as the men alleged, resulting in his experiments." The court noted that Employer's theory was not "based on ordinary knowledge or common experience," and wrote:

> Rather, the specific gravity of air, oxygen and acetylene are not subjects within a layperson's knowledge. Neither are the effects of wind speed and direction on a given afternoon. Here, knowledge of those subjects came only from amateur research, not from expertise. Even if a layperson gains knowledge through research, that does not qualify him to confirm scientifically valid experiments. *See generally McDaniel v CSX Transp.,* S.W. 2d 257, 265 (Tenn. 1997) (discussing factors for determination of scientific validity.)

Finally, the court addressed the inconsistencies and initial inaccuracies of the workers' recounting of the event. The trial court found that, even in light of these discrepancies, there was no direct evidence that the injury was the result of horseplay or intentional misconduct. The court noted that all three men testified they did not intentionally make or explode acetylene bombs, and Employer produced no witnesses to testify otherwise. The court determined the members of the welding team were credible witnesses, noting that Diffee's testimony that he placed a bottle under the hose reels was supported by the physical evidence. Furthermore, the court noted Employer's own internal report of the incident identified causative factors contributing to the incident and suggested corrective actions, but it made no mention of horseplay. Thus, the court concluded Employee was likely to prevail at trial in proving a compensable accident and ordered Employer to pay Employee's outstanding medical bills and to furnish ongoing medical treatment. Employer has appealed.

## Standard of Review

The standard we apply in reviewing the trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2024). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2024).

## Analysis

Employer raised several issues on appeal, which we combine and restate as whether the trial court erred in its assessment of the evidence by rejecting Employer's defenses and determining Employee would likely prevail at trial. We conclude that the evidence does not preponderate against the trial court's findings at this interlocutory stage of the case.

### *Affirmative Defenses*

Tennessee Code Annotated section 50-6-110 identifies certain types of work injuries not covered by the Workers' Compensation Law, including injuries caused by an employee's "willful misconduct" and those caused by an employee's "willful failure or refusal to use a safety device." Tenn. Code Ann. § 50-6-110(a)(1) & (a)(4). When an employer raises any defense based on section 110(a), "the burden of proof shall be on the *employer* to establish the defense." Tenn. Code Ann. § 50-6-110(b) (emphasis added). We have previously addressed appeals in which an employer asserted affirmative defenses under section 110(a) at an interlocutory stage of the case. In *Glasgow v. 31-W Insulation Co., Inc.*, No. 2017-05-0225, 2017 TN Wrk. Comp. App. Bd. LEXIS 51 (Tenn. Workers' Comp. App. Bd. Sept. 6, 2017), we reiterated the four-part test for addressing willful misconduct or willful failure to use a safety device set out by the Tennessee Supreme Court in *Mitchell v. Fayetteville Public Utilities*, 368 S.W.3d 442 (Tenn. 2012). To prevail on these affirmative defenses, the employer has the burden to prove the following: (1) the employee's actual, as opposed to constructive, notice of the rule; (2) the employee's understanding of the danger involved in violating the rule; (3) the employer's bona fide

enforcement of the rule; and (4) the employee's lack of a valid excuse for violating the rule. *Id.* at *13 (citing *Mitchell*, 368 S.W.3d at 453).

Moreover, in *Iboy v. Kenton Management, LLC*, No. 2017-06-1855, 2018 TN Wrk. Comp. App. Bd. LEXIS 23 (Tenn. Workers' Comp. App. Bd. May 8, 2018), we addressed an employer's assertion that its affirmative defense of willful misconduct defeated the employee's interlocutory request for benefits:

> Noting that the lesser evidentiary standard applicable at the expedited hearing stage of litigation "does not require one to prove 'each and every element' of one's claim," Employer argues that "[n]either should [the court] require an Employer to definitely prove each and every element of an affirmative defense" at the expedited hearing stage. However, as previously noted, irrespective of the burden of proof placed on an employer to establish defenses under section 50-6-110(a), section 50-6-239(d)(1) provides that the standard applicable in determining whether an employee is entitled to benefits at an expedited hearing is whether the evidence is sufficient for the court to determine "that the *employee* would likely prevail at a hearing on the merits." Tenn. Code Ann. § 50-6-239(d)(1) (emphasis added). Thus, a trial court can consider whether an employer has come forward with sufficient evidence in support of an affirmative defense at an expedited hearing, but, in the context of an expedited hearing, such considerations are relevant only in assessing whether the employee is likely to prevail at trial.

*Id.* at *17-18.

### Alleged Safety Rule Violation

Here, it is undisputed that wearing eye protection and other PPE is required by Employer when employees are welding; that Employee understood the gravity of the PPE requirement; and that Employee was not wearing eye protection at the time of the incident. Employee argues that he did not willfully fail to wear eye protection because he did not know that Daniels had begun welding. Daniels's and Diffee's testimony supports Employee's assertion, as it is undisputed based on the contents of this record that Daniels told neither Employee nor Diffee that he was beginning to weld. Moreover, there was no evidence presented during the expedited hearing establishing Employer's bona fide enforcement of the rule, which is an essential element of the defense.

Thus, we agree with the trial court that Employer did not come forward with sufficient evidence that its affirmative defense is likely to defeat Employee's claim at trial. Although Employee himself gave conflicting accounts of where his PPE was located at the time of the explosion, it is unrefuted that he was not wearing his PPE because he did not know his co-worker had started welding. Moreover, Employer's own internal report of its investigation noted the existence of various violations related to Daniels's *supervisory*

9

duties and failures to enforce safety rules. In other words, Employer's own investigation determined Employee's *supervisor* failed to follow safety rules, not Employee. Furthermore, Employer has presented no evidence, particularly in light of the violations identified by its internal investigation coupled with TOSHA's investigation, that it engaged in bona fide enforcement of any safety rule requiring supervisors to conduct job briefings or otherwise discuss the work with employees prior to beginning any welding or that there was a safety rule requiring Employee to wear his PPE when active welding was not taking place. As we have explained previously, "[i]t is axiomatic that to succeed with [a willful misconduct] defense, the employer must also establish that there was, in fact, a violation of a safety rule." *Roper v. Allegis Group*, No. 2016-01-0546, 2017 TN Wrk. Comp. App. Bd. LEXIS 14, at *7 (Tenn. Workers' Comp. App. Bd. Feb. 10, 2017). In the absence of proof showing regular, bona fide enforcement of a known safety rule, we cannot conclude the trial court erred in determining Employer's affirmative defenses did not, at this stage of the case, impact Employee's likelihood of prevailing at trial in proving the occurrence of a compensable accident.

### *Alleged Willful Misconduct*

Employer also asserts Employee's interlocutory claim for benefits should be denied because he was injured while engaging in willful misconduct, specifically, horseplay that included intentionally causing beverage bottles to explode. On appeal, Employer contends the trial court

> failed to consider any of the cold, hard investigative findings by two highly trained individuals and chose to base its ruling on the notion that "common sense" dictates that Employee did not act so foolishly, ignored the on-site presence and [Employer's] discovery of multiple additional exploded plastic bottles, disregarded several inconsistencies in the stories told by Employee and his co-workers and the impossibility of their story that [Daniels], standing directly on top of the explosion could be uninjured but that Employee, several feet away, could suffer burns, lacerations, and the loss of an eye.

Employer emphasizes the fact that Daniels initially misled Employer about where the incident occurred; that Employee and his co-workers gave inconsistent statements regarding several facts; and that the story given by Employee and his co-workers "did not make any rational or scientific sense."

Although neither Ward nor Davis was proffered as an expert witness, subject to examination of their qualifications, Employer argues that Rules 701 and 702 of the Tennessee Rules of Evidence allow their opinion testimony and that the trial court failed to give that testimony appropriate weight. Employer insists that the testimonies of both Ward and Davis about their respective investigations and subsequent findings embrace an

ultimate issue to be decided by the trier of fact, thus making their testimony probative and material to Employer's affirmative defenses. Employer also noted that Employee did not object to the admissibility of the testimony and maintains that both individuals possess the knowledge, skill, experience, training, and education to testify competently regarding how the incident could, or, more importantly, could not have occurred. Employer argues that the court's characterization of Ward's investigation as "amateur" is erroneous because he "has had years of experience and training with respect to the elements of acetylene and oxygen during his tenure" with Employer. During oral argument, Employer ultimately acknowledged that neither Ward nor Davis was proffered as an expert and that their investigations and opinions were those of lay witnesses. Nonetheless, Employer argued extensively at oral argument that simple common sense combined with Employer's investigative results should dictate the outcome of this appeal.

Tennessee Rule of Civil Procedure 701 states that the opinion testimony of a non-expert witness "is limited to those opinions and inferences which are: (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or a determination of a fact in issue." Tenn. R. Evid. 701(a). Here, neither Ward nor Davis witnessed the incident. Therefore, their "perceptions" are limited to after-the-fact observations of the scene and experiments based, in part, on YouTube videos. We conclude the trial court did not err in its assessment of the weight of such testimony at this stage of the case.

With respect to Employer's theory of horseplay, Employee responded that any such theory is pure conjecture. The only direct testimony as to what happened came from the three eyewitnesses at the scene of the accident, and all three witnesses denied any efforts to intentionally make the bottle explode or otherwise engage in any act that could be deemed horseplay. Employer's theory, therefore, is heavily dependent on the scientific validity of its accident reconstruction experiments, which were not conducted by an accident reconstruction expert. In short, Employer has presented no proof other than lay witnesses' opinion testimony that the explosion was intentional.

Although the three eyewitnesses' versions of events contained several inconsistencies, Employer has not shown how, precisely, those inconsistencies are relevant to or probative of their theory of the case. As noted by the trial court in its order, we have previously concluded an employer's theory as how an accident may have occurred is not sufficient to meet its burden of proving willful misconduct. *Wilder v. Monroe County Govt.*, No. 2022-01-0177, 2023 TN Wrk. Comp. App. Bd LEXIS 1 (Tenn. Workers' Comp. App. Bd. Jan. 6, 2023). At this stage of the case, Employer's theory that Employee intentionally exploded the bottle, like the employer's theory in *Wilder*, is "based on supposition, conjecture, and a modicum of circumstantial evidence as to possible motive [and] lacks sufficient evidence to support it." *Id.* at *12-13. Several of the eyewitnesses' inconsistencies, such as where each man was standing when the bottle exploded, could be explained simply by the sudden and traumatic nature of the incident. Daniels

11

acknowledged initially misleading Employer with regard to the location of the accident, but he corrected that statement the following day and explained why he indicated a different location previously. Other than Daniels's initial falsehood concerning the location of the explosion, Employer did not prove that any inconsistency or inaccuracy was intentional or meant to deceive Employer, and we conclude the evidence presented does not preponderate against the trial court's findings at this time.

In short, Employer asserts Employee *must have been* injured as a result of horseplay. To support this assertion, Employer relies on alleged scientific testing performed by a lay person to assert that the incident could not have occurred as described by Employee and his co-workers. Employer also relies on testimony concerning additional bottles Davis discovered at the site of the accident two months later that appeared to have exploded. However, at some point after those bottles were discovered and brought to Employer's premises, they were inadvertently thrown away. There is no evidence in the record that those additional bottles were subjected to any testing, and Employee apparently had no opportunity to view or examine the additional bottles. There is no evidence those bottles belonged to Employee or any co-worker; that they were involved in any episode of horseplay by any employee of Employer; or that this evidenced a pattern of misconduct by Employee or his co-workers. In sum, there is insufficient evidence in this record to support Employer's theory of horseplay.[4]

Although Employer encourages us to use "common sense" to conclude Employee's injury must have been the result of willful misconduct, the law requires that we consider each party's respective burdens of proof and determine whether the preponderance of the evidence supports the trial court's interlocutory determination that Employee is likely to prevail at trial. Tenn. Code Ann. § 50-6-239(c)(7). We conclude that the preponderance of the evidence supports the trial court's decision at this interlocutory stage of the case.

## Conclusion

For the foregoing reasons, we affirm trial court's order and remand the case. Costs on appeal are taxed to Employer.

---

[4] During oral argument, Employer insisted that both we and the trial court could take judicial notice that acetylene is lighter than air and, if proper judicial notice of this scientific fact were taken, it supports their client's theory of horseplay. We conclude, however, that Employer overstates the significance of that scientific fact as it relates to the circumstances of this case. Even if, pursuant to Tennessee Rule of Evidence 201(b), we can determine the accuracy of that scientific fact "by resort to sources whose accuracy cannot reasonably be questioned," that does not add any strength to Employer's theory of how this explosion occurred given that we do not have reliable expert testimony regarding how the relative weight of acetylene is affected by being in a pressurized state, how pressurized gas is released from the hose in question, the degree of force involved when the gas is released, how close the mouth of the plastic bottle was to the source of the leaking gas, how long the plastic bottle remained in place prior to the explosion, and any number of other variables that could impact how this event occurred.

12



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| William Markin | ) | Docket No. 2023-08-7648 |
| | ) | |
| v. | ) | State File No. 4916-2023 |
| | ) | |
| Memphis Light, Gas | ) | |
| & Water Division, et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | Heard January 21, 2025 |
| Compensation Claims | ) | in Jackson, Tennessee |
| Allen Phillips, Judge | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 19th day of February, 2025.

| Name | Certified Mail | First Class Mail | Via Fax | Via Email | Sent to: |
|---|---|---|---|---|---|
| Casey Shannon<br>Noor Obaji | | | | X | cshannon@thomasonlaw.com<br>nobaji@thomasonlaw.com |
| Monica Rejaei | | | | X | mrejaei@nstlaw.com<br>jkarpovich@nstlaw.com |
| Allen Phillips, Judge | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | X | penny.patterson-shrum@tn.gov |



Olivia Yearwood
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov