**FILED**
**Jul 18, 2025**
**02:22 PM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT NASHVILLE

| | | |
|---|---|---|
| **Huberney Vallejo, o/b/o Jhon Vallejo,** | ) | **Docket No. 2024-60-3896** |
| **Claimant,** | ) | |
| **v.** | ) | |
| **South Power Electric, LLC; The** | ) | **State File No. 860206-2024** |
| **Sheffield Fund; Maddux Electric Co.,** | ) | |
| **Inc.; and Hanover Insurance,** | ) | |
| **Respondents.** | ) | **Judge Kenneth M. Switzer** |

---

## EXPEDITED HEARING ORDER
## GRANTING BENEFITS, FEES, AND COSTS

---

Jhon Vallejo, by his conservator, Huberney Vallejo, requested an expedited hearing seeking benefits for injuries from a tragic work accident at Maddux Electric Company. He suffered a traumatic brain injury and other serious physical injuries. The central issues are whether Mr. Vallejo violated a safety rule, and if not, which respondents must provide benefits. His attorney also seeks fees and costs for an unreasonable denial of benefits.

After an expedited hearing on May 29, the Court finds Mr. Vallejo is likely to prevail at a hearing on the merits that he was the direct employee of South Power, who was uninsured. Mr. Vallejo was also a loaned employee of Maddux, his intermediate and statutory employer. Further, Maddux has not shown a rule violation was the proximate cause of Mr. Vallejo's injuries or that he intentionally violated a safety rule. The Court awards medical and temporary disability benefits, to be paid by South Power Electric, Maddux, and its carrier, Hanover Insurance. The Court additionally finds that Maddux and Hanover unreasonably denied the claim and awards attorney's fees and costs, to be paid by Maddux and Hanover.

### Claim History

Mr. Vallejo was working as an electrician at the West Wilson Middle School on December 1, 2023. He fell from a step ladder and suffered multiple, catastrophic injuries

1

while working for South Power and Maddux. No one witnessed the accident. After approximately four months' hospitalization, Mr. Vallejo was released. His brother/conservator agreed to his transfer to a nursing home, where his treatment continues. Mr. Vallejo has not worked since the accident.

South Power paid temporary disability benefits and continues to cover a part of the cost of the nursing facility. Maddux and its carrier, however, denied the claim in April 2024 and have paid nothing.

Mr. Vallejo filed a petition in May 2024 naming South Power and its carrier, the Sheffield Fund, as the direct employer, and Maddux and its carrier as the statutory employer. He later moved to amend the petition to add R.J. Anderson and its carrier as parties and the principal contractor. After extensive discovery, Mr. Vallejo voluntarily dismissed R.J. Anderson and its insurer without objection. After two failed mediations, the Court held an expedited hearing.

*Testimony of Chris Raimondi*

At the hearing, Chris Raimondi, the president/part-owner of Maddux Electric, explained Mr. Vallejo's presence on the jobsite on the date of injury. He testified that Maddux has its own employees but occasionally used staffing agencies. In 2022, Maddux contracted with South Power, a staffing firm, to provide electrical workers. Mr. Vallejo was one of those workers.

Maddux and South Power entered into a written agreement outlining both parties' rights and responsibilities. It states, "Client [Maddux] to supervise and control on the Client's project location," and Mr. Raimondi agreed that this occurred in practice. Mr. Raimondi stated that Maddux set Mr. Vallejo's hours, told him what to do, inspected his work, and approved his hours. It also had the right to terminate Mr. Vallejo. South Power made sure that Mr. Vallejo was paid and was also contractually obligated to provide workers' compensation insurance for its employees.

At trial, Maddux asserted the defense of intentional failure to follow a safety rule: Maddux requires its regular and contract employees to use its ladders only, because it can only maintain its own equipment. Mr. Raimondi said the rule was in place before Mr. Vallejo's fall and was written in an employee safety manual. Although the manual is not given to contract workers like Mr. Vallejo, Mr. Raimondi testified that he had no doubt that the ladder policy was conveyed to him. He did not testify to personal knowledge of this fact.

Mr. Raimondi did not witness the accident; rather, he came to the accident site on the day it occurred and saw the ladder at issue, which was still standing. The ladder did not belong to Maddux.

2

According to Mr. Raimondi, the ladder policy may have been discussed during the required weekly safety meetings or "toolbox talks." In these conversations, they cover topics such as lifts, ladders, and tolerating weather extremes, although ladder safety is not discussed at every meeting. If handouts are distributed, they are available in Spanish and English "if they want them," and a bilingual worker will interpret it afterward, not contemporaneously. The worker/interpreter conveys "their understanding" of the topic. Mr. Vallejo speaks Spanish.

After every talk, the workers signed a "safety training roster." Maddux offered multiple copies of meeting rosters signed by Mr. Vallejo dated January 11 through November 7, 2023, documenting his attendance. The rosters list the topic discussed; none of them mentions ladder safety in the title of the weekly discussion, although Mr. Raimondi said the topic was brought up other times and not just during these meetings. However, Mr. Raimondi did not attend the safety meetings and did not know who told Mr. Vallejo about the ladder policy.

Mr. Raimondi testified on direct examination that he was "very aware" of the enormity of this claim. If Maddux were found responsible, he was concerned that the safety rating the insurance industry assigns to Maddux will increase, making it more difficult to get future work. Its premiums would increase as well.

Mr. Raimondi said he did not deny the claim but relied on Maddux's carrier, Hanover, to decide whether to deny the claim. His understanding of the reasons for the denial was South Power's lack of insurance and the safety violation. However, he did not know when he and Hanover first talked about the ladder defense. He said it was probably discussed in April or May of 2024. Mr. Raimondi felt the denial was "valid."

Mr. Raimondi admitted on cross-examination that he did not know why the accident occurred. One other worker was present when Mr. Vallejo fell from the ladder, but Mr. Raimondi did not know if that individual witnessed the fall. He assumed the ladder's condition had something to do with the accident, saying it was a "pretty good assumption," based on its safety vendor's report, which was not admitted into evidence. The following exchange also occurred about the cause of the accident:

Q:     [Mr. Vallejo] could've slipped, right?

A:     Very possibly.

Q:     Could've [sic] he have, uh, gotten shocked by something, right?

A:     He could've been knocked off the ladder by the guy in the room; he could've had a fight. I don't know.

3

Q:     That's right.  Nobody knows.  So, all of the safety matters that we're talking about may or may not have anything to do with this accident, correct?

A:     We do not know.

The ladder was cut up and placed in the general contractor's dumpster the day after the accident on Mr. Raimondi's instruction.  Mr. Raimondi said that equipment that is broken or otherwise in disrepair is either fixed or "taken out of use."  He did not know who owned the ladder.  Maddux's safety vendor documented the accident, and Maddux had photos.  He did not take the ladder back to the office to preserve it.  Mr. Raimondi said that, in hindsight, he probably should have kept the ladder.  But he had never been involved in an accident of this nature before, and he was concerned that someone else would use the ladder and become injured.

*Testimony of Kimberly Look*

Ms. Look, an executive general adjuster with Hanover, was assigned this claim in early April 2024.  She completed the April 17, 2024 denial form, which states: "No Employee/Employer relationship.  You are an employee of South Power LLC, [Hanover] is not their insurance company.  Ongoing investigation."  Ms. Look confirmed that was the reasoning of the denial at that point, emphasizing that the investigation was continuing.

Ms. Look could not recall the date when the purported safety-violation defense became apparent.  She refused to "approximate" when that occurred and said it was "a triable issue" due to the safety vendor's investigative report.  She did not contact the author of the safety report for additional verification or information.

Ms. Look is familiar with Tennessee's workers' compensation law: she has 15 years' experience and attends the Bureau's conferences.  She said that Maddux's ladder policy was "company knowledge" but conceded that Mr. Raimondi did not know when Mr. Vallejo learned of the ladder policy or who conveyed it.  She also agreed that Mr. Raimondi did not know how the accident occurred.

Ms. Look further said that South Power did not have workers' compensation insurance on the accident date, but "the claimant is getting medical and income from their employer right now, so I'm not sure exactly what we're doing with that."  She later said, "It's their claim," referring to South Power paying some benefits, and that this was a reason to deny.  After South Power's counsel read the language regarding statutory employers, section 50-6-113, she said that she has read the statute.  On questioning by South Power's counsel, Ms. Look initially said she was "not sure of" the definition of "intermediate contractor" but conceded that R.G. Anderson was the principal contractor and Maddux was the intermediate.

4

The safety issue "has not been determined," Ms. Look testified, and under questioning by Mr. Vallejo's counsel, she asked who the "principal" contractor is in this case. Ms. Look explained, "according to the law, it [liability] goes to 'the principal contractor,'" but she asked, "Who's the principal?," adding that the question is "up to the trier of fact." She said she has the authority to accept the claim, but "[her] job is to defend [her] employer's policy and administer the benefits within the law." Ms. Look agreed that the judge must decide the safety-rule question before she will accept the claim.

Ms. Look discussed whether the safety-rule defense was valid with Maddux. She agreed that defense "trumps all other issues." Ms. Look testified that she was given a copy of a certificate of insurance that listed three potential insurers, and as of the date of trial she did not know which carrier has a policy with South Power for the accident date. As for the ladder, she agreed it was "troubling" that it had been destroyed.

*Testimony of Huberney Vallejo*

Mr. Vallejo's brother and conservator, Huberney Vallejo, has managed his care since the accident. He explained that, on Mr. Vallejo's release from the hospital, a social worker told him that South Power was uninsured and located the current facility. Mr. Vallejo has no particular doctor directing his care. He could not care for him at home. Huberney visits daily and said Mr. Vallejo's condition is worsening: he has suffered infections and a stroke.

*Testimony of Luis Zaldivar*

Luis Zaldivar, co-owner and president of South Power, testified that he learned after Mr. Vallejo's accident that his Tennessee employees were not covered by his workers' compensation policy. He admitted receiving a refund of approximately $50,000 from his carrier before the accident for what he described as "overpayments." Mr. Zaldivar testified that he thought he had coverage on his employees, and now he does. He used a broker to purchase insurance and relied on that individual. He was penalized by the State of Tennessee for having uninsured employees and is currently making payments on the penalty.

Mr. Zaldivar speaks frequently with Huberney and as noted has paid some benefits. He paid Mr. Vallejo temporary disability benefits of $37,291.00 from December 1, 2023, to November 22, 2024, and $17,496 from December 4, 2024, through May 27, 2025. He has also paid for Mr. Vallejo's nursing home, totaling $127,095.93 from April 2024 through February 2025. Mr. Zaldivar did this, he said, because "someone had to help him."

Dennis Overstreet was the superintendent leading the project where Mr. Vallejo was injured. He said that Maddux's rule is to use only Maddux ladders, and that employees and contract workers are told this whenever they need to use a ladder. Mr. Overstreet did not know when, specifically, Mr. Vallejo was told that he should only use Maddux ladders but said that "everybody" was told. He was not onsite on the accident date, does not know what caused the accident, and does not speak Spanish.

Tim Dawes, safety director, agreed that Maddux has a rule that workers use only Maddux ladders, which are labeled as its property. He said the rule is discussed in safety talks and when an employee is new on the job. He did not know the exact date that Mr. Vallejo was informed of the rule. He was filling in for Mr. Overstreet on the day of the accident. He did not witness it but went to the accident scene afterward. He said the ladder, which did not belong to Maddux, was "faulty," "crooked," and "kind of cock-eyed." Mr. Overstreet cut up the ladder the next day.

Mr. Dawes said he uses a safety manual to create the toolbox talks. At his deposition, he agreed he had not gotten to the ladder safety discussion in the toolbox talks during the time Mr. Vallejo worked at Maddux. Mr. Dawes does not speak Spanish, so he does not know what the worker who interprets is communicating. He also did not know how the accident occurred and assumed the ladder was responsible.

Bobby Lowe, the foreman on the jobsite on the date of injury, confirmed that company policy is to use Maddux ladders only. The policy is conveyed if they see someone using a ladder other than one belonging to Maddux. In addition, the ladder policy is mentioned at "basically" every toolbox talk. Mr. Lowe could not give an exact date or time when the ladder policy was conveyed to Mr. Vallejo at a toolbox talk, but insisted, "I know it was talked about." He does not speak Spanish. He identified two workers who typically interpret, but he agreed that they were not witnesses at the trial.

Mr. Lowe did not witness the fall but came to the accident site afterward. He said the ladder was damaged; a "rivet was broken," and it could have caused someone to fall. Mr. Lowe did not know how this accident happened and acknowledged that he was guessing that the ladder was its cause.

Finally, Brian Carr, a superintendent, testified and was onsite on the accident date. He echoed the ladder policy and said the ladders and other tools are kept in "lockup." Every morning the workers meet there, and the rule is conveyed. It is "an understood rule," he

said. Mr. Carr called 9-1-1 that day and saw the ladder did not belong to Maddux. It was "very old" and "ratty," but he could not immediately tell it was broken.[1]

*Stipulations and additional proof*

The parties agreed to the diagnosis, causation, and treatment that Mr. Vallejo is undergoing.

Mr. Vallejo offered a declaration from Dr. Jeffrey Hazlewood, in which he testified that Mr. Vallejo underwent reasonable and necessary treatment for injuries sustained from a fall from a ladder. Dr. Hazlewood concluded that Mr. Vallejo suffered multiple injuries because of the accident, including but not limited to: traumatic brain injury with a Glasgow Coma Scale score of eight upon arrival; subarachnoid hemorrhage; subdural hematoma; skull-based fractures with pneumocephalus; right temporal bone fracture; multiple right-sided rib fractures; right hemopneumothorax; right thoracic and lumbar transverse process fractures (multiple); and right scapular and acromion fractures.

The parties further agreed that all reasonable medical expenses incurred since the date of injury, those currently being incurred, and those that may be incurred in the future, shall be paid under section 50-6-204. To that end, Dr. Hazlewood reviewed the medical bills incurred as of that date, which totaled $3,899,130.97, and concluded that these charges were reasonable and necessary.

Mr. Vallejo's weekly compensation rate is $688.16. He is entitled to temporary total disability benefits since December 1, 2023. By agreement, this will continue until he reaches maximum medical improvement, with credit being given for the benefits already paid.

**Findings of Fact and Conclusions of Law**

*Motion in limine*

Pretrial, Mr. Vallejo filed a motion in limine to exclude the "Maddux Electric Safety and Produce Program" manual.

As background, when Mr. Carr was deposed, Mr. Vallejo's counsel requested a written copy of the manual and was told it would be produced as a late-filed exhibit to the deposition. Maddux produced the manual several weeks later as a PDF file. On receipt, Mr. Vallejo's attorney checked its "properties" and noticed the manual was created after

---

[1] Maddux additionally called Brayan Vallejo as a lay witness. He is Mr. Vallejo's nephew and Huberney's son, who also worked at Maddux on the date of the accident, but he did not witness it. His testimony did not affect the decision, so it will not be summarized.

the deposition. In addition, the document was undated. Counsel requested the document in effect on the date of the accident but never received it, so he filed his motion.

Maddux responded with an affidavit from Mr. Raimondi, stating that he amended the manual but did not alter the ladder policy. Maddux did not offer a copy of the manual in effect on December 1, 2023. At trial, Mr. Raimondi testified that he has a copy of the manual that was in effect on the date of injury.

Maddux moved for permission to late-file it as an exhibit to this order. Mr. Vallejo objected, raising his motion in limine, contending that the policy should have been produced earlier, and questioning whether Mr. Vallejo saw the version Maddux argued it gave to all employees. Mr. Raimondi testified that only Maddux employees received a copy of the manual, so Mr. Vallejo additionally objected on relevance grounds. The Court sustained Mr. Vallejo's objection because the manual was not timely produced or filed and granted his motion in limine.

*Standard applied*

At the interlocutory stage, Mr. Vallejo must prove a likelihood of success on the merits to prevail. Tenn. Code Ann. § 50-6-239(d)(1) (2024); *McCord v. Advantage Human Resourcing*, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7-8, 9 (Mar. 27, 2015).

No one disputes that Mr. Vallejo suffered an accident arising primarily out of and in the course and scope of his employment on December 1, 2023, when he fell from a ladder. His diagnosis, and the treatment he has undergone and will undergo, are related to the work accident.

But two threshold questions must be answered. What was Mr. Vallejo's employment status, and did he intentionally violate a safety rule?

*Loaned employee/special employer*

Hanover denied the claim because: "No Employee/Employer relationship. You are an employee of South Power LLC, [Hanover] is not their insurance company."

The Tennessee Supreme Court in *Winchester v. Seay,* 409 S.W.2d 378 (Tenn. 1966), held: "When a general employer loans an employee to a special employer, the special employer becomes liable for workmen's compensation only if (a) the employee has made a contract of hire, express or implied, with the special employer; (b) the work being done is essentially that of the special employer; and (c) the special employer has the right to control the details of the work." In addition, "[t]he test for whether or not one is a loaned servant focuses less on who was to pay the employee, but instead focuses more on for whom the work was being done." *Federal Ins. Co. v. Penn. Nat'l Mut. Cas. Co.,*

No. M1999-01917-WC-R3-CV, 2000 Tenn. LEXIS 449, at *7 (Tenn. Workers' Comp. Panel Aug. 17, 2000).

The Appeals Board discussed and applied this doctrine and the two above cases in *Smiley v. Four Seasons Coach Leasing, Inc.,* 2016 TN Wrk. Comp. App. Bd. LEXIS 28, at *16-18 (July 15, 2016). The doctrine remains good law under the Reform Act.

Here, the Court finds Mr. Vallejo was a South Power employee, which in turn contracted with Maddux for Mr. Vallejo to work as an electrician. Therefore, an implied contract existed between Mr. Vallejo and Maddux. *Bennett v. Mid-South Terminals Corp.,* 660 S.W.2d 799, 801-802 (Tenn. Ct. App. 1983). Further, the work being done was Maddux's project, and Maddux had the right to control Mr. Vallejo's activities. Although South Power paid him, Mr. Vallejo's work was being done for Maddux. Therefore, the Court holds Mr. Vallejo is likely to prevail at trial in proving South Power was his direct employer and Maddux was a special employer.

*Failure to follow a safety rule*

Section 50-6-110(a)(1) provides that "[n]o compensation shall be allowed for an injury or death due to . . . [t]he employee's willful misconduct." *Mitchell v. Fayetteville Pub. Utils.,* 368 S.W.3d 442 (Tenn. 2012), gave the framework for trial courts in analyzing the affirmative defense of willful misconduct.

To prevail, the respondents must show: "(1) the employee's actual, as opposed to constructive, notice of the rule; (2) the employee's understanding of the danger involved in violating the rule; (3) the employer's bona fide enforcement of the rule; and (4) the employee's lack of a valid excuse for violating the rule." The burden of proof "is on the employer to demonstrate that the willful misconduct or the willful failure to use a safety appliance was the proximate cause of the injuries." *Id.* at 448-449.

Applying these principles, importantly, no respondent has shown that the ladder's use was the proximate cause of Mr. Vallejo's injuries. While the ladder he was using did not belong to Maddux, no proof showed that the ladder's condition caused his fall. Mr. Raimondi testified that he does not know why the accident occurred but rather he "assumed" the condition of the ladder, which did not belong to Maddux, played a role. He conceded that a slip, shock, or altercation with a coworker could have been the cause of the fall, among other possibilities—which bear no relation to who owned the ladder. None of Maddux's other witnesses saw the accident, either—nor could they say how or why it occurred.

This defense further requires the respondents to show four elements, including "the employee's actual, as opposed to constructive, notice of the rule." Here, Mr. Raimondi was unable to state when or by whom Mr. Vallejo learned of Maddux's ladder policy. The

other Maddux workers testified that the ladder policy was well-known, but they, too, were unable to say when or who communicated the ladder rule to Mr. Vallejo.

Without actual notice of the ladder policy, Mr. Vallejo cannot have acted willfully or intentionally in violating that policy. Therefore, without proximate cause or actual notice, this defense fails; and the Court need not examine the other *Mitchell* factors. Mr. Vallejo is likely to prevail at a hearing on the merits that the safety-rule defense does not apply.

*Statutory Employer*

Under the Tennessee Workers' Compensation Act, "an employee injured in an accident while in the course and scope of employment is generally limited to recovering workers' compensation benefits from the employer." § 50-6-103; *Fayette Janitorial Servs. v. Kellogg USA, Inc.,* No. W2011-01759-COA-R-CV, 2013 Tenn. App. LEXIS 66, at *7 (Tenn. Ct. App. 2013).

However, the statute requires other parties to pay benefits to an injured worker under certain circumstances:

> A principal contractor, intermediate contractor or subcontractor shall be liable for compensation to any employee injured while in the employ of any of the subcontractors of the principal contractor, intermediate contractor or subcontractor and engaged upon the subject matter of the contract to the same extent as the immediate employer.

§ 50-6-113(a). "These provisions have been a part of the Act since its inception in 1919, and their purpose is to protect injured employees from irresponsible and uninsured subcontractors." *Osborne v. Starrun, Inc.,* 2017 TN Wrk. Comp. App. Bd. LEXIS 70, at *9 (Nov. 8, 2017), *aff'd,* No. E2018-00282-SC-R3-WC, 2018 Tenn. LEXIS 656 (Tenn. Workers' Comp. Panel Oct. 19, 2018).

In *Osborne,* the Appeals Board cited longstanding case law that section 50-6-113 "operates by passing along to upstream contractors the responsibility either to require their immediate contractors or subcontractors to provide workers' compensation coverage to their own employees or to be responsible for the coverage themselves." *Id.* Section 50-6-113 deems this "principal [or intermediate] contractor to be the injured employee's 'statutory employer.'" *Id.*

Considering this statute and case law interpreting it, subdivision 50-6-113(a) uses mandatory language: an "intermediate contractor or subcontractor *shall be liable . . .* to the same extent as the immediate employer." (Emphasis added). The Court finds that the

contract between South Power and Maddux created the direct employer/immediate employer-subcontractor relationship.

Maddux and Hanover made an equity argument that Mr. Raimondi reasonably relied on South Power and Mr. Zaldivar to provide coverage for Mr. Vallejo. Importantly, however, Maddux cited no case supporting this position, and the Court declines to read into the statute this type of exception. Also, an employer cannot contract away their statutory duties under the Workers' Compensation Law. § 50-6-114(a).

Therefore, Mr. Vallejo is likely to prevail at a hearing on the merits in showing that South Power, which was uninsured on the date of the accident, is liable, along with Maddux and Hanover as the next entity up the chain.

*Benefits*

The next question is the benefits to which Mr. Vallejo is entitled. The parties agreed that if the claim were deemed compensable, he is entitled to benefits under section 50-6-204. This requires the employer to furnish reasonable, necessary, and related medical benefits and offer the employee a panel of physicians. § 50-6-204(a)(3)(A)(i). Mr. Vallejo currently has no physician directing his treatment for multiple injuries. Therefore, the Court holds he is entitled to a panel of specialists who can treat traumatic brain injuries. The chosen specialist shall evaluate and treat him, to include making any reasonable and necessary referrals. South Power, Maddux, and Hanover shall be responsible for offering the panel.

As for past medical benefits, given the agreement and Dr. Hazlewood's opinion that Mr. Vallejo's previous treatment was reasonable, necessary, and related to the fall at work, South Power, Maddux, and Hanover must pay for this as well. Mr. Vallejo has accrued $3,899,130.97 in past medicals, which these respondents must pay, subject to the fee schedule. South Power is entitled to credit for sums it has already paid.

Turning now to temporary disability benefits, Mr. Vallejo's weekly compensation rate is $688.16, or $98.31 per day. He is entitled to temporary total disability benefits from December 1, 2023, and ongoing. This totals 545 days, or $53,578.95. Mr. Zaldivar testified he has paid $54,787 as of the date of trial, so he has overpaid by $1,208.05. South Power, Maddux, and Hanover shall continue to pay weekly benefits until Mr. Vallejo reaches maximum medical improvement.

*Entitlement to attorney's fees and costs*

Mr. Vallejo's attorney asked for fees and costs. As Maddux pointed out, the Appeals Board has held that "absent highly unusual circumstances, a case should be permitted to largely run its course, unencumbered by uncertainties over future

11

developments and the twists and turns inherent in litigation, before an award of attorney's fees and costs is made." *Thompson v. Comcast Corp.,* 2018 TN Wrk. Comp. App. Bd. LEXIS 1, at *37 (Jan. 30, 2018). In addition, "a decision to award attorneys' fees and expenses at an interlocutory stage of a case should be made only in extremely limited circumstances." *Id.* at *29.

Interestingly, Maddux also agreed in their brief that the Court should decide the issue at this stage because a compensation hearing in this case is unlikely. Therefore, after thorough consideration of the proof, the Court finds that this case presents highly unusual and extremely limited circumstances supporting an award of fees and costs.

Section 50-6-226(d)(1)(B) states that a court may award attorney's fees and costs "in addition to attorneys' fees [otherwise] provided for in this section" when an employer "*[u]nreasonably* denies a claim or *unreasonably* fails to timely initiate any of the benefits to which the employee . . . is entitled under this chapter[.]" (Emphasis added).

The legislature amended this subdivision in 2023, effective April 13, 2023, to substitute "unreasonable" for "wrongful." The 2023 amendment also deleted the former last sentence, which read: "For purposes of this subdivision (d)(1)(B), 'wrongfully' means erroneous, incorrect, or otherwise inconsistent with the law or facts."

The Appeals Board has not offered guidance on the definition of "unreasonable" in this context since then. *McCool v. Prof. Care Servs., LLC,* 2025 TN Wrk. Comp. App. Bd. LEXIS 22, at *5 (July 10, 2025). Dictionaries define "unreasonable" as follows: "Not guided by reason; irrational or capricious," *Black's Law Dictionary* 1537 (7th ed. 1999); "Not governed by or acting according to reason; not conformable to reason: absurd; exceeding the bounds of reason or moderation," *Merriam-Webster Dictionary,* https://www.merriam-webster.com/dictionary/unreasonable (last visited July 18, 2025).

With that in mind, the Court will consider the reasonableness of each respondent's actions.

First, Mr. Raimondi admitted he did not know how the accident occurred but only "assumed" the ladder was in some way responsible. He conceded that other causes could have been involved. He maintained that he did not deny the claim and let Hanover take the lead. He agreed he did not know when Mr. Vallejo learned of the ladder rule or who conveyed it to him. Mr. Raimondi ordered the ladder's destruction and said that, in hindsight, he wishes he had not. His rationale—he had no prior experience with an accident of this magnitude and wished to prevent another accident—is plausible. Yet, this decision foreclosed further inspection of the ladder, which could have yielded useful information and potential evidence to all parties.

Regardless, Mr. Raimondi said the denial was valid and that he relied on his insurer to make the decision. The Court is unpersuaded. He had input on the decision, and notably, he testified on direct examination that he was concerned about preserving an affordable insurance industry rating for future work and keeping his coverage costs down. The Court finds his actions were not guided by reason.

Next, as for Maddux's insurer, Hanover, it did not raise willful misconduct as a defense to the initial dispute certification notice in September 2024, although other respondents did.[2] This contradicts Ms. Look's testimony that she knew about the safety violation sometime around April, when she denied the claim. The denial likewise did not mention a safety-rule violation at all and instead stated that Mr. Vallejo was not Maddux's employee. Yet, Ms. Look acknowledged that Maddux had contracted with South Power for Mr. Vallejo's services on its project.

Ms. Look's insistence that she did not know who the principal contractor is rings hollow, nor was that fact relevant to the decision to deny. Ms. Look has 15 years' experience as an adjuster and testified that she attends Bureau conferences. The rule regarding statutory employers has been a part of Tennessee workers' compensation law since 1919 and has been discussed many times in case law since then. The loaned employee doctrine is likewise a longstanding part of Tennessee workers' compensation law. Ms. Look's expressed lack of knowledge on these legal aspects is perplexing, and her testimony overall was evasive and argumentative. The Court finds her actions also were capricious and not guided by reason.

As for Mr. Zaldivar, his actions were a mixed bag. He failed to provide workers' compensation insurance for Mr. Vallejo and other South Power employees working in Tennessee for some time, as the agreement between South Power and Maddux required. These actions were negligent. But Mr. Zaldivar credibly testified that he thought the policy with The Sheffield Fund covered his Tennessee employees and the $50,000 refund was for "overpayments." More importantly, though, South Power has been paying temporary disability benefits and covering the cost of the nursing home, which expenses have been sizeable. South Power is also in compliance with the law now regarding covering its employees, and Mr. Zaldivar is making payments to the Bureau on the penalty. He had no role in Maddux denying the claim, nor did he fail to timely initiate benefits. Therefore, the Court find his overall actions were guided by personal responsibility, moral character, and reason.

Further, although this issue is raised at an interlocutory stage, the parties have engaged in thorough written discovery and have taken 13 depositions about the facts underpinning the fee award and specifically the safety-rule violation defense. Mr.

---

[2] Maddux and Hanover were previously represented by another attorney, who later withdrew from the case with the Court's permission.

Vallejo's attorney has spent much time and effort—hundreds of hours—in this denied claim to secure the relief he is entitled to. These facts will not change.

In *Thompson,* the Board affirmed a fee award under somewhat similar circumstances: the employer refused to offer a panel of specialists over several months' time, and that fact would not change—nor would the fact change that the employee's attorney had to undertake significant work to secure the requested relief. *Thompson,* 2018 TN Wrk. Comp. App. Bd. LEXIS 1, at *32.

Therefore, considering all the above, the Court holds that Mr. Vallejo is likely to prevail at a hearing on the merits that he is entitled to attorney's fees and costs for an unreasonable denial.

South Power argued that this award should not be assessed against it, given that Mr. Zaldivar testified to paying temporary disability benefits and covering the cost of Mr. Vallejo's nursing home. The Court finds South Power has also come into compliance with the law by obtaining workers' compensation insurance for its Tennessee workers and is making payments on the penalty. The Court agrees with South Power and orders that Maddux and Hanover alone are responsible for the attorney fee and costs award.

In addition, the Court refers this case to the Compliance Program for consideration of penalties. Section 50-6-118(a) permits penalties for: bad faith denial of claims; failure of an employer to timely provide a panel of physicians that meets the statutory requirements of this chapter; and wrongful failure of an employer to pay an employee's claim for temporary total disability payments. The Compliance Program will determine whether Maddux and Hanover violated these provisions.

*Fees and costs awarded*

The next and final question is, how much?

The trial court's determination of a reasonable attorney's fee is "a subjective judgment based on evidence and the experience of the trier of facts" and "is within the discretion of the trial court." *Wright ex rel. Wright v. Wright,* 337 S.W.3d 166, 176 (Tenn. 2011). The Court must make specific findings under Tennessee Supreme Court Rule 8, Rules of Professional Conduct 1.5(a). *Id.* at 169-70.[3]

---

[3] The relevant factors are:
- the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
- the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
- the fee customarily charged in the locality for similar legal services;
- the amount involved and the results obtained;

Mr. Vallejo's Counsel asked for a sum representing 20% of the unpaid medical bills, or $779,826.19, to be paid by the respondents. As Maddux argued, this relief is impermissible. *See Bowlin v. Servall, LLC,* No. W2020-01708-SC-R3-WC, 2021 Tenn. LEXIS 532, at *18-19 (Tenn. Workers' Comp. Panel Aug. 13, 2021) ("section 50-6-226(a)(1) indicates that the attorney's fees [for unpaid medical bills] are to be paid by the party employing the attorney").

However, the Court finds requiring Mr. Vallejo to pay a fee of $779,826.19 to be unreasonable and unfair under the circumstances of this case, as that amount would be deducted from Mr. Vallejo's recovery for his permanent disability and would likely leave him with nothing for that loss.

Instead, the Court considers the alternative method Mr. Vallejo's counsel suggested: fees based on hourly rates and services performed. Counsel filed an affidavit requesting fees for 620 hours of legal work, broken down as follows:

| Role | Hourly Rate | Hours |
|---|---|---|
| Partner/Attorney | $475 | 182.75 |
| Associates | $300 | 235.50 |
| Paralegals | $150 | 153.00 |
| Translator | $75 | 48.75 |
| **Total Estimated Hours** | | 620 |

Applying the factors in the Supreme Court Rule, the Court finds that this case required extensive time and labor. Counsel provided a detailed breakdown of time spent on each task. His affidavit summarized the significant events in the litigation, performed by a team, including: participation in multiple status conferences; ongoing communication with several attorneys; written discovery; attendance at mediation; conducting 13 depositions; site visits to confer with Mr. Vallejo; extensive communication with medical providers, and obtaining their records; constant communication with Huberney; and substantial legal research, drafting, developing litigation strategy, and case management.

As to the novelty and difficulty of the issues, cases involving statutory employers or a willful misconduct defense are not unusual, nor is the law unsettled. But as previously stated, the respondents declined to accept a claim where the facts strongly suggested Mr.

- the time limitations imposed by the client or by the circumstances;
- the experience, reputation, and ability of the lawyer or lawyers performing the services;
- whether the fee is fixed or contingent;
- whether the fee agreement is in writing.

Vallejo's likelihood of prevailing at a hearing on the merits. That steadfast denial certainly complicated prosecuting the case.

As to the skill requisite to perform the legal service properly, Mr. Vallejo's counsel brings over 30 years' experience, which the Court finds was necessary to achieve the outcome. The Court additionally finds that the significant work counsel and his team expended on this case very likely precluded them from attending to other cases.

As for the fee customarily charged in the locality for similar legal services, Mr. Vallejo's counsel did not offer affidavits from other attorneys to support the hourly rates he charges. However, South Power and Maddux did not dispute the reasonableness of the hourly rates. Therefore, based on the evidence of this Court's experience practicing law in Davidson County for over 30 years before taking the bench, the Court finds the following hourly rates reasonable: $475 for partner/attorney; $300 for associates; $150 for paralegals; and $75 for interpreters.

Next, Maddux argued that some of the time entries "are clearly clerical functions" and therefore are not appropriate for a fee award. But it did not identify specific entries that it considers "clearly clerical," nor did it offer authority that clerical work is impermissible as part of a fee award.

Likewise, Maddux and South Power characterized some of the work as outside the workers' compensation claim, including the immigration and conservatorship/probate work. Mr. Vallejo's counsel adequately explained these tasks/costs. Mr. Vallejo missed an asylum hearing due to the injury and his resulting incapacity, which compounded the expense of the immigration litigation. Stated another way, but for his hospitalization from the work injury, those legal expenses would not have been incurred. They therefore reasonably became a part of this workers' compensation claim. Mr. Vallejo could not prosecute his claim were he deported solely due to the missed hearing. As for the conservatorship, Counsel's role in its creation was necessary for many reasons, including having a competent party to name on Mr. Vallejo's behalf as a party in this lawsuit. The Court rejects both contentions.

Maddux further asserted that paralegal time is not permissible in a fee award. The Court disagrees. *See Lowe v. Johnson Cnty.,* 1995 Tenn. App. LEXIS 320, at *27 (Tenn. Ct. App. 1995) (trial court order modified to increase the fee award and affirmed an award that included paralegal time).

As to the amount involved and the results obtained, the medical bills alone, as of the date Dr. Hazlewood considered them, were approaching $3.9 million. This is a sizeable sum compared to the amounts at stake in most cases in this Court. The results obtained were very favorable to Mr. Vallejo. The Court finds these factors support a fee award according to the hours counsel has claimed.

Turning now to time limitations, since April 2024, Mr. Vallejo has resided in a nursing home where no physician directs his care. Huberney credibly testified that his brother's condition is worsening. This factor suggests some urgency to securing an order for medical benefits and specifically a panel of specialist physicians, so one may assume responsibility for his care. The Court finds this factor favors counsel's requested fee.

As to counsel's qualifications, he brought lengthy professional experience, a concentration in workers' compensation, and a history of successfully representing clients in the trial and appellate courts. The Court finds this factor favors his requested award.

Counsel accepted this claim on a contingency basis. In his affidavit, counsel testified to the "high financial and professional risk" associated with contingency cases. "An attorney's fee should be greater where it is contingent than where it is fixed." *United Medical Corp. v. Hohenwald Bank & Trust Co.*, 703 S.W.2d 133, 136 (Tenn. 1986). This factor also favors counsel's request.

In sum, nearly every factor favors an award reflecting the hours counsel and his staff spent. Therefore, the Court finds:

| Role | Hourly Rate | Hours | Total |
|---|---|---|---|
| Higgins-partner | $475 | 182.75 | 86,802.25 |
| Larson/Byrd-associates | $300 | 211.25/24.25 = 235.50 | 70,650.00 |
| Paralegals | $150 | 153 | 22,950.00 |
| Interpreters | $75 | 48.75 | 3,656.25 |

This totals $184,058.50. The Court finds this amount reasonable and awards it, to be paid by Maddux and Hanover.

Finally, Mr. Vallejo's counsel seeks costs. Section 50-6-226(d)(1) defines "reasonable costs" as "including, *but not limited to,* reasonable and necessary court reporter expenses and expert witness fees for depositions and trials." (Emphasis added). The statute permits the Court to exercise discretion. As nonbinding but helpful guidance, Rule 54.04 of the Tennessee Rules of Civil Procedure lists allowable discretionary costs as: "reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions (or stipulated reports) and for trials, reasonable and necessary interpreter fees[.]"

Respondents argued that some costs are not permissible. Specifically, South Power argued against awarding costs for "deportation hearing-attorney," and both Maddux and South Power asserted that costs for creating a conservatorship should not be allowed. As previously stated, both were necessary in prosecuting this claim.

Therefore, considering the above authorities, Mr. Vallejo's counsel is entitled to reimbursement of the following:

- Beres & Associates Court Reporters, 3/10/25 — 205.45
- Beres & Associates Court Reporters, 5/5/25 — 1,491.70
- Beres & Associates Court Reporters, 5/30/25 — 220.00
- Probate expenses — 2,649.69
- Axelrod Immigration Law, 11/4/24 — 3,000.00
- Axelrod Immigration Law, 10/3/12 — 3,000.00
- Axelrod Immigration Law, 10/3/24 — 450.00
- Adonis Sanson, interpreter, 2/24/25 — 300.00
- Dr. Jeffrey Hazlewood, 9/19/24 — 1,200.00

These costs total $12,516.84. The Court exercises its discretion to disallow costs for securing medical records, postage, litigation support, Medicare set-aside consultation, and copies. The remainder of the requested costs is denied.

**IT IS, THEREFORE, ORDERED AS FOLLOWS**:

1. South Power, Maddux, and Hanover shall offer Mr. Vallejo a panel of traumatic brain injury specialists. The chosen specialist shall evaluate and treat him as necessary, to include making any reasonable and necessary referrals.

2. South Power, Maddux, and Hanover must pay all past medical expenses incurred relative to this injury, subject to the fee schedule. South Power is entitled to a credit for medical expenses paid to date.

3. Mr. Vallejo is entitled to $53,578.95 in temporary total disability benefits. South Power has paid $54,787 as of the trial date, so it has overpaid by $1,208.05.

4. South Power, Maddux, and Hanover shall continue to pay $688.16 in weekly temporary disability benefits from the date of trial until Mr. Vallejo reaches maximum medical improvement. Mr. Vallejo's attorney is entitled to 20% of past and ongoing benefits as attorney's fees.

5. Mr. Vallejo's attorney is additionally awarded fees and costs for an unreasonable denial totaling $184,058.50 and $12,516.84, respectively, to be paid immediately and in lump sums by Maddux and Hanover.

6. This case is referred to the Compliance Program for consideration of penalties against Maddux and Hanover.

7. The Court sets a status hearing on **October 27, at 10:00 a.m. Central Time.** The parties must dial 615-532-9552 or 866-943-0025 to participate.

8. Unless interlocutory appeal of this expedited hearing order is filed, compliance with this order must occur by seven business days of entry of this order as required by Tennessee Code Annotated section 50-6-239(d)(3). The Insurer or self-insured employer must submit confirmation of compliance by email to WCCompliance.Program@tn.gov by the compliance deadline. Failure to do so may result in a penalty assessment for non-compliance. For compliance questions, please contact the Workers' Compensation Compliance Unit by email at WCCompliance.Program@tn.gov.

**ENTERED July 18, 2025.**


_Kenneth M. Switzer_____
**JUDGE KENNETH M. SWITZER**
**Court of Workers' Compensation Claims**

**Exhibits**

1. Wage statement-amended
2. Video
3. Joint Stipulations
4. Respondent South Power Electric, LLC's Amended Response to Petitioner's Request for Admissions
5. Maddux Electric Co., Inc.'s Supplemental Answers to Petitioner's First Request for Admissions
6. Contract for Labor Staffing
7. Safety Training Rosters
8. Certificate of Liability Insurance
9. Denial Notice and cover letter
10. Order Appointing Conservator
11. Declaration of Jeffrey Hazlewood
12. Declaration of Attorney James S. Higgins
13. Schedule C, Form 1040, Profit or Loss from Business
14. Contractor Payments
15. The Sheffield Fund, Workers' Compensation Coverage
16. Affidavit for Attorney's Fees

## CERTIFICATE OF SERVICE

I certify that a copy of this order was sent as shown on July 18, 2025.

| Name | Email | Sent to |
|---|---|---|
| Jim Higgins, Leila Larsen, claimant's attorneys | X | jsh@higginsfirm.com<br>leila@higginsfirm.com<br>Luci@higginsfirm.com |
| Jim Exum, Jennifer Ball, attorneys for South Power Electric, respondent | X | JFExum@chamblisslaw.com<br>jball@chamblisslaw.com |
| Dawson Ogletree, attorney for The Sheffield Fund, respondent | X | dogletree@lgwmlaw.com |
| Kitty Boyte, attorney for Maddux Electric and Hanover Insurance, respondents | X | kitty.boyte@petersonwhite.com<br>denise.mccorkle@petersonwhite.com |
| Compliance Program | X | WCCompliance.Program@tn.gov |

_____

**PENNY SHRUM**
**Clerk, Court of Workers' Compensation Claims**
**WC.CourtClerk@tn.gov**



<u>Right to Appeal</u>:

If you disagree with the Court's Order, you may appeal to the Workers' Compensation Appeals Board. To do so, you must:

1. Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims before the expiration of the deadline.
    ➢ If the order being appealed is "expedited" (also called "interlocutory"), or if the order does not dispose of the case in its entirety, the notice of appeal *must* be filed *within seven (7) business days* of the date the order was filed.
    ➢ If the order being appealed is a "Compensation Order," or if it resolves all issues in the case, the notice of appeal *must* be filed *within thirty (30) calendar days* of the date the Compensation Order was filed.
   When filing the Notice of Appeal, you must serve a copy on the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You are responsible for ensuring a complete record is presented on appeal. If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee. If you choose to submit a transcript as part of your appeal, which the Appeals Board has emphasized is important for a meaningful review of the case, a licensed court reporter must prepare the transcript, and you must file it with the Court Clerk. The Court Clerk will prepare the record for submission to the Appeals Board, and you will receive notice once it has been submitted. For deadlines related to the filing of transcripts, statements of the evidence, and briefs on appeal, see the applicable rules on the Bureau's website at https://www.tn.gov/wcappealsboard. (Click the "Read Rules" button.)

4. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties.

   **If neither party timely files an appeal with the Appeals Board, the Court Order becomes enforceable. See Tenn. Code Ann. § 50-6-239(d)(3) (expedited/interlocutory orders) and Tenn. Code Ann. § 50-6-239(c)(7) (compensation orders).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



# NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____
**Employee**

v.

_____
**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies). Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____    ☐ Motion Order filed on _____

☐ Compensation Order filed on_____    ☐ Other Order filed on_____

issued by Judge _____.

## Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

## Parties

**Appellant(s)** (Requesting Party): _____ ☐ Employer ☐ Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐ Employer ☐ Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____

*[Signature of appellant or attorney for appellant]*