FILED
Mar 23, 2026
07:00 AM(CT)
TENNESSEE COURT OF
WORKERS' COMPENSATION
CLAIMS



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# IN THE COURT OF WORKERS' COMPENSATION CLAIMS
# AT NASHVILLE

| | |
|---|---|
| Jessie Harris,<br>    Employee,<br>v.<br>Express Employment Professionals,<br>    Employer,<br>and<br>AIU Insurance Co.,<br>    Carrier. | Docket No. 2025-60-7980<br><br>State File No. 74312-2025<br><br>Judge Kenneth M. Switzer |

## EXPEDITED HEARING ORDER GRANTING BENEFITS

Jessie Harris suffered a devastating crush injury while working for Express Employment Professionals last fall.

The Court held an expedited hearing on March 10, 2026, on his entitlement to specialist panels after an authorized provider made referrals. Express honored a referral for treatment with an orthopedist but declined to offer panels for the three remaining specialties. It later denied the entire claim.

Express raised defenses of willful misconduct and illegal drug use, further contending that its participation in the Tennessee Drug-Free Workplace Program entitled it to a presumption that Mr. Harris's drug use was the proximate cause of the accident. It additionally challenged whether the need for specialist treatment arose out of the work accident and whether the referrals are reasonable and necessary.

These defenses are unpersuasive. Rather, the Court grants Mr. Harris's requests, awards attorney's fees, and refers Express to the Compliance Program for the imposition of penalties.

1

# Claim History

## *Mr. Harris's proof*

Mr. Harris worked for Express, a staffing agency, and was placed at Crescent Brands, LLC, where he worked as an anodizing technician.

On October 14, 2025, he was working in an area designated for anodizing personnel only.  On the instruction of his direct supervisor, Anthony Buck, Mr. Harris checked the plumbing in a lower-level dye tank that he had cleaned and repaired earlier in the day.

Mr. Harris then returned to the raised catwalk in his normal work area.  Once there, his role was to observe automated, unmanned cranes and ensure they functioned properly.  He looked down into the tank, checking from that viewpoint whether the plumbing in the tank was working.

Suddenly a crane carrying a rack rolled toward his back.  When he looked up and turned around, one of the crane's hooks pressed forcefully into his ribs, pushing and pinning his body against the dye tank.  Mr. Harris said he had little time to react, but he moved his arms to prevent a worse injury.

The crane was in automated mode and should not have been moving, he explained.  The crane was supposed to be positioned in front of him, according to Mr. Harris.  He said, "I did everything that was asked of me that day."  He also said that if he had known the crane was moving, he would not have looked down into the tank when he did.

Mr. Harris said he was written up for attendance early in his employment with Express/Crescent Brands but never for job performance.  He never went to any location on the plant where he was not permitted to be.  Mr. Harris said his initial training largely consisted of watching a PowerPoint presentation about topics such as wearing personal protective equipment.

As for Mr. Harris's drug use, Express pointed to three separate post-accident drug-test results showing THC in his system.  The records say "pos" for THC but do not suggest an amount.  Mr. Harris acknowledged the results and testified that "in late September" about two weeks before the accident, he consumed a THC edible at home.  Mr. Harris emphasized that he has never gone to work under the influence of

drugs or alcohol and his consumption of the edible had no effect on him becoming injured.

Mr. Harris additionally said no one explained the consequences of failing a drug test and specifically that it could affect his eligibility for workers' compensation. He learned of this after the accident. Mr. Harris agreed that he knew any drug use was prohibited for employment with a member of the Drug-Free Workplace Program.

He could not recall getting any documentation that Express is a member of the Drug-Free Workplace Program at the time of hire. Mr. Harris likewise did not recall knowing that it is a member or signing a document pledging to abstain from drugs. Mr. Harris said he was drug-tested when he started at Express. He could not recall any training on the Drug-Free Workplace Program—its requirements or why it was implemented.

Mr. Harris testified that his mental health currently is "not what I want it to be, honestly." He easily "gets overwhelmed" with his children, a toddler and an infant, and he becomes winded quickly on any physical exertion.

He requested that Express give him panels for the other three referrals: pulmonology, neurology, and mental-health; reinstate treatment with Dr. Fish and temporary disability benefits; and award attorney's fees.

*Express's proof*

Express offered the testimony of two Crescent Brands employees, Joe Gunnels and Ronnie Loftus, neither of whom witnessed the accident but assisted Mr. Harris until emergency medical services arrived.

Mr. Gunnels, plant manager, explained that the cranes have an "operational side," so anodyzers can manually operate them, and a "nonoperational side" with no controls. Mr. Gunnels testified that the accident occurred on the "nonoperational side" of the crane, where Mr. Harris was not supposed to be. Anodyzers are supposed to stay on the operational side, and this would be conveyed during training. He did not know why Mr. Harris was in that location before the accident and said it was "unsafe."

Anodyzers should be aware of the cranes' movement at all times, Mr. Gunnels said. When an anodyzer is watching the cranes, they should do no other tasks at the

3

same time.  To clarify, anodyzers perform other tasks beside observing the cranes—but they should not attempt to do both at the same time.

Training at Crescent Brands is not in the classroom.  Rather, Mr. Gunnels stated that all new employees receive "hands-on training," meaning they observe an individual coworker performing the actual job and then do the task themselves.  It typically takes about two months to learn the anodyzer job.

Mr. Buck and Mr. Loftus trained Mr. Harris.  Mr. Gunnels agreed it was "fair" to say that, despite "corporate oversight," in practice, decisions might be made within the plant that do not comply with corporate vision.  Mr. Gunnels had no "reason to believe" that Mr. Harris "willfully" went against the job rules to repair the tank.  Further, no policy prohibits an anodyzer from having his back to the crane.  Mr. Gunnels could not recall if he saw Mr. Harris before the accident on the day of injury.

As for Mr. Loftus, he is an anodyzer and lab tech, who said that on the date of the accident, the cranes were operating "normal[ly]."  Cranes are switched into nonoperational mode when an anodyzer is checking the rack to inspect its color, he explained.  Mr. Loftis said Mr. Harris should have been on the control side to check the rack, which is company "policy."

In addition to the witnesses, Express offered proof of its participation in the Drug-Free Workplace Program.  It submitted a copy of an application and a July 2025 memo from the Bureau of Workers' Compensation confirming its acceptance into the program.  The memo contains a disclaimer: "By accepting this application the State of Tennessee is not certifying the accuracy or completeness of either your application or your Drug-Free Workplace Program."

*Medical proof*

Immediately after the accident, Mr. Harris was intubated and life-flighted to a hospital, where he underwent level-one trauma treatment for "polytrauma, respiratory failure."  He sustained multiple rib fractures and small bilateral pneumothoraxes.  He was discharged on October 16.

On October 19, Mr. Harris was transported by ambulance to another hospital complaining of chest pain, shortness of breath, and headaches.  He said the provider there told him he likely had a panic attack.  Mr. Harris was diagnosed with chest pain and released that same day but told to follow up with a primary care doctor.

After his release, Express, directed Mr. Harris to a walk-in clinic on October 28, where he saw nurse practitioner Aleaha Carey.

Among Ms. Carey's diagnoses were a "closed fracture of multiple ribs, both sides," and "traumatic pneumothorax" from a crush injury. She also diagnosed "anxiety with depression," noting that Mr. Harris reported a panic attack a week ago and that he "is having trouble talking about the event and even thinking about it. [S]tates he has alot [sic] of anxiety in general since the accident. [S]ome depression." Ms. Carey further diagnosed upper-back pain and migraines. She concluded, "spent an hour or more total time in coordinating care of this complicated patient."

Ms. Carey referred Mr. Harris to a neurologist, psychiatrist, pulmonologist, and orthopedist. The medical records containing the referrals were signed by both her and Dr. John Pennington.

Express offered an orthopedist panel on October 31, and Mr. Harris chose Dr. James Fish. It never gave panels for any of the other specialties and never explained that decision to Mr. Harris.

On November 19, Mr. Harris first saw Dr. Fish, who diagnosed thoracic radiculitis, cervical spondylosis with radiculopathy, and lumbrosacral spondylosis with radiculopathy. Records from follow-up visits were not introduced. Dr. Fish prescribed physical therapy but made no referrals. According to Mr. Harris, Dr. Fish said he was "not comfortable nor obligated" to make referrals; those needed to come from a primary care physician. Treatment with him ended after Express denied the claim on March 3, 2026.

As to the propriety of the referrals, Express questioned whether the need for some of the referrals was due to preexisting conditions. It argued that Mr. Harris suffers from ADHD, necessitating the psychiatric referral. In response, Mr. Harris testified that when he was a teenager, he took ADHD medication but has not taken it for years now.

Express additionally relied on Dr. Fish's opinion that the referrals are neither related to work nor reasonable and necessary. It offered Dr. Fish's February 24, 2026 response to a letter asking several questions.

Among them, it asked: "Would these three additional referrals be 'reasonable and necessary medical care' in relation to Mr. Harris's work incident on October 14, 2025?" Dr. Fish checked no and explained, "He sustained a significant crush injury with multiple fractures. He will heal in time & not need long term care."

Express asked another (somewhat repetitive) question: "Is it in your opinion to a reasonable degree of medical certainty (>50%) that these three referrals are necessary to treat any injuries or the condition he sustained from the incident on October 14, 2025?" Doctor Fish check no and explained: "He is stable from a psychological, neurological, and pulmonary perspective."

Finally, Express then asked Dr. Fish to consider the AMA Guides to the Evaluation of Disease and Injury Causation, 2nd Edition. Express then asked, "With this, would the need for any additional medical care outside of the current orthopedic care Mr. Harris is receiving be caused by the workplace incident occurring on October 14, 2025." Dr. Fish checked no without explanation.

## Findings of Fact and Conclusions of Law

Mr. Harris must offer sufficient evidence that he is likely to prevail at a hearing on the merits. Tenn. Code Ann. § 50-6-239(d)(1) (2025); *McCord v. Advantage Human Resourcing*, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7-8, 9 (Mar. 27, 2015).

*Defenses*

Injuries caused by an employee's "willful misconduct" or "illegal drug usage" are not covered under the Workers' Compensation Law. *Id.* § 50-6-110(a)(1). When an employer raises any defense under this subsection, "the burden of proof shall be on the employer to establish the defense." *Id.* § 50-6-110(b).

Turning to the first defense, the Supreme Court gave a four-part test for willful misconduct in *Mitchell v. Fayetteville Public Utilities*, 368 S.W.3d 442, 453 (Tenn. 2012). To prevail, the employer must prove: (1) the employee's actual, as opposed to constructive, notice of the rule; (2) the employee's understanding of the danger involved in violating the rule; (3) the employer's bona fide enforcement of the rule; and (4) the employee's lack of a valid excuse for violating the rule. *Id.*

As the Appeals Board explained, "[I]t stands to reason that the existence of a violation must occur to successfully invoke this defense." *Iboy v. Kenton Mgmt.,*

*LLC*, 2018 TN Wrk. Comp. App. Bd. LEXIS 23, at 819 (May 8, 2018). Further, "an employee's negligent or reckless actions generally are not enough to defeat a claim for workers' compensation benefits." *Roper v. Allegis Grp.,* 2017 TN Wrk. Comp. App. Bd. LEXIS 14, at *11 (Feb. 10, 2017).

Applying these principles, Express at no point clearly articulated a "rule" that Mr. Harris allegedly violated, other than asserting that he was on the nonoperational side of the crane, an area where he was not supposed to be, when the accident occurred. Express's proof was Mr. Gunnels's and Mr. Loftus's testimony; it offered no employee handbook, safety manual, or other written proof of the existence of this rule. Further, Express/Crescent Brands gave mostly informal, "hands-on" training. Neither witness explicitly said that they conveyed this rule to Mr. Harris or knew that Mr. Buck had communicated it, and the purported rule was apparently not given during the PowerPoint.

In contrast, Mr. Harris credibly testified that the crane was in automated mode rather than manual mode immediately before the accident and should not have been moving. The crane was supposed to be positioned in front of him. He also said that if he had known the crane was moving, he would not have looked down into the tank when he did. It might have been negligent or even reckless for him to look into the tank and take his eyes off the crane. But he was checking the tank on Mr. Buck's instruction and not through his own willful misconduct. Notably, Mr. Buck did not testify, live or by declaration. Finally, Mr. Harris insisted that he never went to any location on the worksite where his presence was not permitted.

The Court credits Mr. Harris's testimony and finds that Express has not shown that he had actual, as opposed to constructive, notice of a "rule," or that Mr. Harris understood the danger involved in violating the rule, as *Mitchell* requires. On this record, Express is unlikely to prevail at trial on this defense.

Next, Express argued that Mr. Harris's drug use caused the accident and contended that it is entitled to a presumption to that effect because it is a member of the Tennessee Drug-Free Workplace Program.

The Appeals Board explained:

If an employer has implemented a drug-free workplace program consistent with certain statutory and regulatory requirements and an employee fails a post-accident drug test, "then it is presumed that the drug . . . was the proximate cause of the injury." Tenn. Code Ann. §

7

50-6-110(c)(1). This presumption is not conclusive, however, but may be rebutted by clear and convincing evidence that the employee's . . . drug use was not the proximate cause of the injury. *Id.* On the other hand, if an employer has not implemented a drug-free workplace program, the employer bears the burden of establishing that the employee's . . . drug use was the cause of the accident in order to avoid paying benefits.

*Bowlin v. Servall,* 2018 TN Wrk. Comp. App. Bd. LEXIS 6, at *8 (Feb. 8, 2018).

In *Bowlin,* the Board affirmed the trial court's decision that the presumption did not apply because the employer had not strictly complied with the statutory and regulatory requirements of the Drug-Free Workplace Program. *Id.* at *11-12.

Here, Mr. Harris testified that he could not recall receiving training on the program's rules at any time. He likewise could not recall receiving any written documentation about the program's purpose or rules, and importantly, he never received instruction on the consequences of if he failed a drug test, post-accident. He only learned that it might affect his eligibility for benefits after his injury. Express offered no contrary proof.

Tennessee Compilation Rules and Regulations 0800-02-12-.11(2) (2018) requires covered employers to provide at least one hour of training to all employees at least once. Express offered no proof of compliance. In fact, the memo when the Bureau accepted its application noted that the program "was not certifying the accuracy or completeness of either your application or your Drug-Free Workplace Program." So, under *Bowlin,* the Court finds that Express is not entitled to the presumption that the THC in Mr. Harris's system was the proximate cause of his injury.

The question then becomes whether Express has shown that Mr. Harris's drug use was the cause of the accident. Mr. Harris candidly acknowledged that he ingested THC approximately two weeks before the accident but maintained that he was not impaired on the day it occurred. Express again offered no contrary proof. The Court credits this testimony as well. On these facts, Express is unlikely to prevail at trial on this defense as well.

*Medical benefits*

Subsection 50-6-204(a)(1)(A) requires an employer to furnish treatment made reasonably necessary by a work accident. An injured worker must accept treatment, provided that an employer has offered a panel of physicians. *Id.* § 50-6-204(a)(3)(A)(i). The physician selected from a panel, when necessary, "shall make referrals" to a specialist physician, and the employer has three business days to offer a panel. *Id.* § 50-6-204(a)(3)(A)(ii).

Tennessee Compilation Rules and Regulations 0800-02-01-.06(1) (2018) states that "an employer shall, as soon as practicable but no later than three (3) business days after receipt of [a treatment] request, provide the employee a panel of physicians as prescribed in T.C.A. § 50-6-204." The rules echo the statute, so that an employer must honor a referral within three business days. Tenn. Comp. R. & Regs. 0800-02-01-.06(8).

Here, Express offered a panel of orthopedists on October 31, well past three business days. But before it did so, it directed Mr. Harris to a walk-in clinic. Subdivision (5) of the above rule further states that "walk-in clinics" may be listed on medical panels.

In addition, subdivision (7) permits "nurse practitioners, physician assistants and other mid-level practice extenders under the supervision, direction and ultimate responsibility of a licensed physician" to provide medical treatment. The rule further states, "Notwithstanding this use of practice extenders in treatment settings, only the supervising physician may be listed on an Employee Choice of Physician Form C-42, may determine medical causation regarding the injury, may issue a permanent impairment rating, and may determine the date of an injured employee's maximum medical improvement."

Applying the facts to the statute and these rules, the Court finds that Mr. Harris went to the walk-in clinic and saw a nurse practitioner because Express sent him there.

Ms. Carey, under Dr. Pennington's supervision, direction, and ultimate responsibility, made the referrals—a task that the above rule does not prohibit her from doing. She spent over an hour with this "complicated patient" and explained her conclusions in detail. But most importantly, by signing the nurse practitioner's medical records, Dr. Pennington adopted her recommendations as his own.

Express offered no authority stating that a supervising physician must actually see and evaluate the employee when working with a mid-level provider. Moreover, Express chose to honor just one of her recommendations and inexplicably ignored three others.

As for Express's contention that preexisting conditions caused the need for the psychiatric referral, it offers no supporting medical opinion. "Parties and their lawyers cannot rely solely on their own medical interpretations of the evidence to successfully support their arguments. *Lurz v. Int'l Paper Co.,* 2018 TN Wrk. Comp. App. Bd. LEXIS 8, at *17 (Feb. 14, 2018).

Again, Mr. Harris credibly testified that he has not taken ADHD medication for several years. Further, the argument that Mr. Harris's ADHD as a teenager somehow relates to Mr. Harris's post-accident anxiety approximately five years later, shows a complete misunderstanding of these two distinct mental-health conditions. This argument is meritless.

Dr. Fish's responses to Express's attorney's letter are also unpersuasive, for several reasons.

First, Dr. Fish is an orthopedic specialist—not a pulmonologist, neurologist, or psychiatrist. He is well-qualified to give opinions on Mr. Harris's orthopedic condition. But he is on the same footing as Dr. Pennington when it comes to deciding whether specialist treatment for fields outside his area of expertise is warranted. By Mr. Harris's testimony, Dr. Fish even told him he was not comfortable with making other referrals.

Second, although Express argued that Mr. Harris has seen Dr. Fish at least three times since the initial visit, it did not offer records from those visits. Since the Court has no documentation on how Dr. Fish formed his opinions, the Court cannot place significant weight on his conclusions. Further, while Dr. Fish wrote that Mr. Harris is "stable from a psychological, neurological, and pulmonary perspective," that does not necessarily mean that Mr. Harris could not benefit from an evaluation and potential treatment from specialists within those areas. The specialists, using their expertise, must decide causation, medical necessity, and treatment within their specialty.

Third, while Dr. Fish became an authorized treating specialist physician after Mr. Harris selected him from a panel, an injured worker might have more than one authorized treating physician at a given time, especially when suffering from

multiple severe injuries, as in this case. *See, e.g.*, *Cummings-Boyd v. Law Offs. of Jeffrey A. Garrety, P.C.,* No, W2021-00720-SC-R3-WC, 2021 Tenn. LEXIS 535 (Tenn Workers' Comp. Panel Mar. 4, 2022).

Fourth, Express asked Dr. Fish to consider a treatise on causation that has not been adopted as a required resource for physicians under the Tennessee Workers' Compensation Law. Asking him to do so improperly gave Dr. Fish an incorrect perception of the causation standard in Tennessee.

Fifth and most importantly, Express cannot offer Dr. Fish's after-the-fact causation or medical necessity opinions to rewrite the history of Mr. Harris's care—or lack thereof. Stated another way, whatever Dr. Fish's status may be now, once Ms. Carey and Dr. Pennington made referrals, Express was required to honor them. *See Rooks v. Amazon.com,* 2025 TN Wrk. Comp. App. Bd. LEXIS 20, at *11 (May 20, 2025) (honoring a referral is a "statutorily-mandated" obligation). Express did not do so.

Sixth, and finally, Mr. Harris credibly testified that he has ongoing mental health struggles and cannot exert himself without becoming winded. Because he has expressed a desire to see the specialists, and Express offered no valid defense, the Court finds that Mr. Harris has satisfied his burden to show he is likely to prevail at a hearing on the merits that he is entitled to this treatment.

*Attorney's fees and penalty referral*

Mr. Harris requested attorney's fees under section 50-6-226(d)(1)(B) for Express's unreasonable failure to timely initiate medical benefits. The Court found above that these benefits are owed after an expedited hearing.

Attorney's fees at the interlocutory stage of a case are only allowed in extremely limited circumstances. *Thompson v. Comcast Corp*., 2018 TN Wrk. Comp. App. Bd. LEXIS 1, at *28-29 (Jan. 30, 2018). The Court finds these circumstances support an award of fees now.

In *Thompson,* the Board awarded fees at the interlocutory stage, reasoning that "over the course of approximately five months, Employer declined to offer Employee a panel of . . . specialists as recommended by the authorized treating physician based solely on its own interpretation of the medical records and without seeking an expert medical opinion to support its denial." The Board continued: "Regardless of the ultimate resolution of the case, Employee's entitlement to a panel

of . . . specialists as recommended by the authorized treating physician, and Employer's five-month refusal to offer such a panel, *will not change.*" *Id.* at *30-31 (Emphasis added).

The same can be said here. Express's lack of an excuse to timely furnish panels when an authorized physician referred Mr. Harris for specialist care will not change at trial. This failure already has caused him an unnecessary delay—close to five months—in undergoing the recommended evaluations. Mr. Harris is likely to prevail at a hearing on the merits regarding this request.

Finally, the Court refers Express for the imposition of penalties for failing to timely provide treatment recommended by an authorized physician and to timely provide a panel. *Id.* § 50-6-118(a)(8), (9).

**IT IS, THEREFORE, ORDERED** as follows:

1. Express shall furnish Mr. Harris with panels of pulmonologists, neurologists, and psychiatrists.

2. Express shall schedule a follow-up appointment with Dr. Fish. It shall also reinstate temporary total disability benefits, retroactive to March 3, 2026. Mr. Harris's attorney remains entitled to 20% of these amounts as fees.

3. Express is referred to the Compliance Program for penalties under subsection 50-6-118(a)(8) and (9) for failure to timely furnish medical treatment and a panel.

4. Mr. Harris's counsel may file an affidavit for attorney's fees under subsection 50-6-226(d)(1)(B) for Express's unreasonable failure to furnish medical benefits. The affidavit shall be itemized by task, date of performance, time spent, and the requested hourly rate. He must file it within ten days of the date of this order. Express shall have five days to respond.

5. A Status Hearing is set for **June 15 at 10:30 a.m. Central Time.** The parties must call 615-532-9552 or 866-943-0025 to participate.

6. Unless appealed, compliance must occur within seven business days of entry of this order as required by Tennessee Code Annotated section 50-6-239(d)(3).

**ENTERED March 23, 2026**.


*Kenneth M. Switzer*
**JUDGE KENNETH M. SWITZER**
**Court of Workers' Compensation Claims**

**APPENDIX**

Exhibits:
1) Mr. Harris's declaration
2) Employer's medical records
3) Mr. Gunnels's declaration
4) Panel
5) Dr. Fish's responses to Employer's Letter
6) Drug-Free Workplace Program application and memo

**CERTIFICATE OF SERVICE**

I certify that a copy of this Order was sent as indicated on March 23, 2026.

| Name | Email | Sent to |
|---|---|---|
| Adam Brock-Dagnan, employee's attorney | X | Adam.brockdagnan@forthepeople.com Christopher.howell@forthepeople.com |
| Katherine Hinkle, Gregory Fuller, employer's attorneys | X | ghfuller@mijs.com kxhinkle@mijs.com |
| Compliance Program | X | WCCompliance.Program@tn.gov |


Penny Shrum
Clerk, Court of Workers' Compensation Claims
WC.CourtClerk@tn.gov



<u>Right to Appeal</u>:

If you disagree with the Court's Order, you may appeal to the Workers' Compensation Appeals Board. To do so, you must:

1. Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims before the expiration of the deadline.
   - If the order being appealed is "expedited" (also called "interlocutory"), or if the order does not dispose of the case in its entirety, the notice of appeal *must* be filed *within seven (7) business days* of the date the order was filed.
   - If the order being appealed is a "Compensation Order," or if it resolves all issues in the case, the notice of appeal *must* be filed *within thirty (30) calendar days* of the date the Compensation Order was filed.

   When filing the Notice of Appeal, you must serve a copy on the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You are responsible for ensuring a complete record is presented on appeal. If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee. If you choose to submit a transcript as part of your appeal, which the Appeals Board has emphasized is important for a meaningful review of the case, a licensed court reporter must prepare the transcript, and you must file it with the Court Clerk. The Court Clerk will prepare the record for submission to the Appeals Board, and you will receive notice once it has been submitted. For deadlines related to the filing of transcripts, statements of the evidence, and briefs on appeal, see the applicable rules on the Bureau's website at https://www.tn.gov/wcappealsboard. (Click the "Read Rules" button.)

4. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties.

   **If neither party timely files an appeal with the Appeals Board, the Court Order becomes enforceable. See Tenn. Code Ann. § 50-6-239(d)(3) (expedited/interlocutory orders) and Tenn. Code Ann. § 50-6-239(c)(7) (compensation orders).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



## NOTICE OF APPEAL
Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____      ☐ Motion Order filed on _____

☐ Compensation Order filed on_____      ☐ Other Order filed on_____

issued by Judge _____.

### Statement of the Issues on Appeal
Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

### Parties
**Appellant(s)** (Requesting Party): _____ ☐ Employer ☐ Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐ Employer ☐ Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____

*[Signature of appellant or attorney for appellant]*